**Victor E. SIMAS, Plaintiff,**

**v.**

**FIRST CITIZENS' FEDERAL CREDIT UNION, Barbara Silva, and Lisa Grace, Defendants.**

**Civil Action No. 96–10073–RBC.**

United States District Court,
D. Massachusetts.

Aug. 30, 1999.

Philip N. Beauregard, Beauregard & Burke, New Bedford, MA, for plaintiff.

Michael P. Duffy, Harvey Weiner, Peabody & Arnold LLP, Boston, MA, for defendants.

**FURTHER MEMORANDUM AND THIRD ORDER ON DEFENDANTS, FIRST CITIZENS' FEDERAL CREDIT UNION, BARBARA SILVA AND LISA GRACE'S MOTION FOR SUMMARY JUDGMENT (# 26)**

COLLINGS, Chief United States Magistrate Judge.

### I. Introduction

In an earlier decision in this case I granted the defendants' Motion for Summary Judgment on the plaintiff's sole federal claim of constructive discharge and discrimination in violation of Title 12 U.S.C. § 1790b, a federal whistleblower statute relating to federal credit unions, and further declined to exercise supplemental jurisdiction over the remaining state law claims. *See Simas v. First Citizens' Federal Credit Union*, 996 F.Supp. 76 (D.Mass., 1998).[1] On appeal, however, the First Circuit vacated that judgment and "remanded [the case] for further proceedings consistent with [its] opinion." *Simas v. First Citizens' Federal Credit Union*, 170 F.3d 37, 52 (1 Cir., 1999). With the federal claim now reinstated, the arguments advanced in support of the dispositive motion with respect to the state law claims must be addressed.

### II. Background

Plaintiff Victor Simas (hereinafter "Simas") was employed by defendant First Citizens' Federal Credit Union (hereinafter "First Citizens") from 1983 to May 3, 1994. At all relevant times he served as vice-president of collections and credit at the financial institution. Defendant Barbara M.W. Silva (hereinafter "Silva"), who held the positions of Chief Operating Officer and President of First Citizens, was Simas' supervisor. The third defendant named in the complaint was Lisa A. Grace (hereinafter "Grace"), a senior vice-president of First Citizens.

Simas has delimited the extant claims in his complaint in that he only opposes defendants' motion for summary judgment on his claim under 12 U.S.C. § 1790b as to Defendant First Citizens, on his claim for wrongful termination as to Defendant First Citizens, on his claim for tortious interference as to Defendant Silva, and on his claim for defamation as to Defendants First Citizens and Silva. (Plaintiff's Opposition To Defendants' Motion For Summary Judgment (# 34) at 1) In other words, the remaining state law claims in this action are: (1) wrongful termination against First Citizens (Count I); (2) defamation against First Citizens and Silva (Count II); and (3) tortious interference with an advantageous relationship against Silva (Count VI). Moreover, the practical effect of Simas' statement that he "does not oppose Defendants' motion as to his remaining claims[,]" is that Grace is entitled to the entry of judgment in her favor as a matter of law on all claims alleged against her. *Id.* at 1–2.

Briefly recapping the highlights of the First Circuit decision, in his lone federal claim Simas alleges that he was constructively discharged and discriminated against by his employer First Citizens in violation of the whistleblower provision of

---

1. Pursuant to 28 U.S.C. § 636(c), with the parties' consent this case has been referred to the undersigned for all purposes including trial and the entry of judgment.

the Federal Credit Union Act which provides that:

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee ... provided information to the [National Credit Union Administration (NCUA)] Board ... regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

Title 12 U.S.C. § 1790b(a)(1).

For a plaintiff to prove a case of retaliation in violation of this statute, it must be established that

> (1) the claimant engaged in the protected activity (e.g., filed a complaint or reported information to the government); (2) the defendants subjected the claimant to some materially adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action.

*Simas*, 170 F.3d at 44 (citations omitted).

In the instant case, First Citizens does not dispute whether Simas contacted the NCUA; rather, the contention is that the credit union was unaware he had in fact done so and, consequently, § 1790b should not apply. *Id.* at 45. The Court of Appeals concluded that genuine issues of material fact exist on the question, however, pointing out that it was undisputed Silva knew in the Fall of 1993 that Simas had threatened to contact the NCUA about the Xifaras loan; there was no evidence anyone else at First Citizens had made similar threats; and third, the Xifaras loan documents were examined at unusual length by NCUA officials in January, 1994.[2] *Simas,*

170 F.3d at 45. Based on these factors, the First Circuit determined that a jury could have concluded Silva made the connection that Simas was indeed the whistleblower. *Id.*

On the second element, Simas must show that First Citizens engaged in either of the following activities:

> (1) an actual or constructive 'discharge'; or (2) other 'discriminat[ion] ... with respect to compensation, terms, conditions, or privileges of employment' short of discharge, or what we have sometimes labeled 'adverse employment actions.'

*Simas,* 170 F.3d at 46 (*quoting* 12 U.S.C. § 1790(a)(1)).

The test to determine whether an individual suffered a constructive discharge is whether the "working conditions [were] so intolerable [ ] that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." *Id.* (*quoting Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 480 (1 Cir., 1993)). The First Circuit did not determine if the plaintiff made out a case of constructive discharge, but rather rested its decision upon the "adverse employment actions" showing. *Simas,* 170 F.3d at 47.

The alleged abuses endured by Simas were assessed to be potentially "more than minor slights."[3] *Id.* at 46. In addition, the Court observed that "otherwise minor slights, relentlessly compounded, may become sufficiently 'adverse' to warrant relief under the FCUA." *Id.* at 48. The First Circuit directs attention to Silva's animus toward Simas when he threatened to approach the NCUA as more than subtle evidence that Silva looked disfavorably upon Simas' whistleblowing actions. Silva

---

2. In mid–1990, First Citizens made an $800,-000 loan to one Louis Xifaras who at the time was Vice Chair of the First Citizens' Board as well as a close friend of Lisa Grace. This was the loan about which Simas had concerns and was the reason that he contacted the NCUA. *See Simas,* 170 F.3d at 42.

3. The First Circuit catalogues those maltreatments as including: removal of Simas from overseeing the Xifaras loan, being stripped of his supervisory authority, being denied a car loan, being denied consideration of a senior vice president slot, being denied unfettered access to the file vault, and being denied the right to attend meetings of the Board of Directors. *Simas,* 170 F.3d at 42, 50.

threatened to fire Simas if he continued to make " 'unwarranted charges or threats [to report his suspicions to the NCUA].' " *Id.* at 48. "So construed, these direct retaliatory expressions by Silva could be considered materially adverse employment actions which sufficed to preclude summary judgment for defendants." *Id.* Such conduct is exactly what was to be targeted by the whistleblower provision: "Congress intended that section 1790b deter federal credit unions from expressly dissuading their employees in exercising the statutory right to report suspected regulatory violations." *Id.*

### III. The Remaining State Law Claims

Simas alleges in Count I that he was wrongfully terminated by First Citizens "in violation of public policy" in that "[defendant's] true reason for constructively discharging Mr. Simas was in retaliation for his conduct and whistleblowing." (Complaint ¶ 27) Once again the argument is interposed that the credit union was not aware that Simas had contacted the NCUA and consequently could not have engaged in adverse employment actions that would have caused the plaintiff to resign from his employment.

Massachusetts does not have a statute that protects a private-sector employee who engages in whistleblowing activity and is then terminated by an employer in retaliation.[4] Furthermore, it is well established in the Commonwealth that at-will employees can be terminated for any reason or no reason at all. *See, e.g., Folmsbee v. Tech Tool Grinding & Supply,* 417 Mass. 388, 394, 630 N.E.2d 586, 590 (1994); *Smith v. Mitre Corp.,* 949 F.Supp. 943, 948 (D.Mass., 1997). There is a dearth of evidence in the record to suggest that Simas was anything but an at-will employee and, in fact, Simas does not assert otherwise.

The plaintiff's claim for wrongful termination rests on an exception to the general at-will employment rule: employers may not terminate their employees if such action is in violation of public policy. *See Flesner v. Technical Communications Corp.,* 410 Mass. 805, 810, 575 N.E.2d 1107, 1110 (1991); *DeRose v. Putnam Management Co., Inc.,* 398 Mass. 205, 208–09, 496 N.E.2d 428, 430–31 (1986); *Mitre,* 949 F.Supp. at 948. Whether there is a sufficiently defined public policy is a matter of law for the Court to determine. *See Mitre,* 949 F.Supp. at 949; *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 472, 589 N.E.2d 1241, 1243 (1992) (whether employee was terminated in violation of public policy by retaliatory employer was a question of law for the Court). "It is not for the jury to define the public policy. The judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated." *Mello v. Stop & Shop Companies, Inc.,* 402 Mass. 555, 561, n. 7, 524 N.E.2d 105, 108, n. 7 (1988). Nonetheless, the Supreme Judicial Court "consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would 'convert the general rule ... into a rule that requires just cause to terminate an at-will employee.' " *King v. Driscoll,* 418 Mass. 576, 582, 638 N.E.2d 488, 492 (1994) (*quoting Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.,* 404 Mass. 145, 150, 533 N.E.2d 1368, 1371 (1989)).

A federal statute, such as 12 U.S.C. § 1790b, can be the basis for the public policy exception needed to make a claim of wrongful termination under Massachusetts law. Not all federal statutes, though, give rise to state public policy exceptions. *See Hutson v. Analytic Sciences Corp.,* 860

---

4. Massachusetts General Laws chapter 149, § 185 relates to employers who retaliate against employees who report "violations of law or risks to public health, safety or environment[.]" However this provision only encompasses public sector employers: "the commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof."

F.Supp. 6, 8 (D.Mass.1994) Rather, "the federal law must concern or involve state public policy to support a state cause of action". *Id.* The question, therefore, is whether there is any basis in Massachusetts state law for finding that Massachusetts would recognize as its own policy the protections afforded whistleblowers set forth in § 1709b.

■ I find that there is. In one instance the SJC has "assume[d] in [its] analysis ... that an at-will employee who 'blew the whistle' within his company on wrongdoing is entitled to protection...." *Mello,* 402 Mass. at 560, n. 6, 524 N.E.2d at 108, n. 6. It has also been suggested that whistleblowing would fall under the penumbra of "performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Flesner,* 410 Mass. at 810–11, n. 3, 575 N.E.2d at 1111, n. 3. Finally, the distinction between a whistleblower who complained about criminal wrongdoing internally verses one who complained outside the company was recently eliminated:

> A policy that protects an at-will employee who, in good faith, reports criminal conduct in her place of employment to public authorities, but does not protect an at-will employee who in good faith reports such conduct to her superiors would be illogical. In neither case should the reporting of suspected criminal activity be discouraged by the threat of discharge.

*Shea v. Emmanuel College,* 425 Mass. 761, 763, 682 N.E.2d 1348, 1350 (1997) (citation omitted).

Thus, the concept of affording protection to whistleblowing employees is not foreign to Massachusetts law, and it seems likely that § 1790b would provide an adequate basis upon which to premise a public policy of the Commonwealth. *See, e.g., Hutson,* 860 F.Supp. at 12. Further, Simas' whistleblowing to the NCUA "rises to such a level of social import as to implicate the exception." *Mitre,* 949 F.Supp. at 951.

It is to be recalled that the parties dispute whether Simas resigned, as the defendants allege, or was constructively discharged, as the plaintiff asserts.[5] As discussed earlier, the First Circuit concluded that there were genuine issues of material fact as to whether First Citizens engaged in adverse employment actions. "Since we are required to assess defendants' [adverse employment] conduct in context and in totality, rather than piecemeal, we conclude that summary judgment on the FCUA claim was improvidently granted, and must be vacated." *Simas,* 170 F.3d at 52 (citations omitted).

The evidence that will be proffered at trial to prove the claim under § 1790b will be coincident with that required to make out a state law claim of wrongful termination in this case. Given these circumstances, there is no need to decide definitively whether § 1790b would provide the basis for a state public policy at this juncture or, indeed, what the contours of that policy might be. Count I shall go forward with the public policy question to be revisited prior to the jury charge.[6]

Turning now to Count II, the plaintiff's defamation claim against defendants Silva and First Citizens is premised on two instances of conduct. First, Simas asserts that he was defamed when he was escorted from the building two weeks prior to his

---

**5.** Simas takes the position that he was fired because he was told to leave two weeks prior to the date he had decided to end his employment with First Citizens. *Simas,* 170 F.3d at 46.

**6.** Such a procedure has been endorsed:

> The judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has

been violated. If there is such a basis, the judge must advise the jury what that public policy is and that, if they find that the employer discharged the employee for particular conduct that is protected by that public policy, they would be warranted in returning a verdict for the employee.

*Mello,* 402 Mass. at 561, n. 7, 524 N.E.2d at 109, n. 7.

intended date of resignation. Second, Silva refers to Simas as a "disgrunted [sic] employee" in a May 3, 1994 letter she wrote to the NCUA. The plaintiff need only provide sufficient evidence to raise genuine issues of material fact on one of these examples to prevail at the summary judgment stage. *See Bander v. Metropolitan Life Ins. Co.*, 313 Mass. 337, 345, 47 N.E.2d 595, 600 (1943) (separate incidences of defamation gave rise to only one cause of action). That being said, he must, however, proffer sufficient evidence as to how *each* defendant purportedly defamed him.

■ In order to recover on a claim of defamation under Massachusetts law, Simas must establish that the defendants used "false and defamatory written communication of and concerning the plaintiff." *McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513, 517 (1988) (citations omitted). Moreover an individual's actions, separate from any written or spoken statements, may be sufficient grounds for a jury to find a cause of action. *See Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. 697, 705 (D.Mass., 1996).

■ The defendants argue that the action of escorting Simas out of the credit union building did not constitute defamation. In support of their position, Silva and Federal Citizens rely on the case of *Zechman v. Merrill, Lynch, Pierce, Fenner & Smith*, 742 F.Supp. 1359 (N.D.Ill., 1990). In that case, plaintiff Zechman filed a claim of defamation *per se* under Illinois state law, alleging that the way in which he had been escorted out of his office amounted to defamation *per se*.[7]

*Zechman*, 742 F.Supp. at 1370. Defendant Merrill, Lynch asserted, under the innocent construction rule, that since someone could interpret the way Zechman had been escorted out as nothing but innocent (i.e., not associated with any criminal wrongdoing), summary judgment should be granted on the defamation claim. *Zechman*, 742 F.Supp. at 1371 ("A statement will not be found defamatory *per se*, however, if it is reasonably capable of an innocent interpretation."). The District Court agreed and dismissed the claim, but allowed Zechman to amend his complaint to allege defamation *per quod* concluding that "[a]lthough the innocent construction rule defeats a claim of defamation *per se*, it does not apply to statements alleged to be defamatory *per quod*." *Id.* at 1372.

Years ago Massachusetts abolished the distinction between *per se* and *per quod* defamation. *See Sharratt v. Housing Innovations, Inc.*, 365 Mass. 141, 147, 310 N.E.2d 343, 347 (1974). Consequently, the context in which a seemingly benign action was conducted is to be considered. *See Colby Haberdashers, Inc. v. Bradstreet Co.*, 267 Mass. 166, 170, 166 N.E. 550, 551 (1929) (facts may "show that in consequence of the circumstances attending their publication the words were intended to convey or would or could be understood to convey a derogatory meaning not on their face."). In one case when denying the defendants' motion for summary judgment on the plaintiff's defamation claim, the court wrote "it is possible that the [way in which the plaintiff was escorted from her office and building] may have been conducted in such a manner as to communicate a defamatory statement to

---

7. As detailed by the district court:

In connection with his discharge, Zechman alleges, Merrill Lynch (1) made, in the plain view of Merrill Lynch employees and others, an unprecedented surprise visit to Zechman's office; (2) refused to allow Zechman to speak to his staff; (3) remained with Zechman in his office while he packed up some of his personal belongings and prevented him from finishing; (4) interrogated Merrill Lynch employees and others about entries in his travel and entertainment expense account; and (5) escorted him out of the building. The cumulative impact of this series of acts, Zechman alleges, was to communicate the false and defamatory assertion that Zechman had committed a serious criminal act or substantial breach of ethics, which precipitated his discharge; Zechman charges that this assertion constitutes defamation per se. *Zechman*, 742 F.Supp. at 1370.

other employees about the plaintiff." *Petsch–Schmid*, 914 F.Supp. at 705.

The facts at hand are that Simas gave his two-week notice on May 2, 1994, but was told the next day by the Chief Financial Officer/Senior Vice–President of First Citizens, Michael DeBarros (hereinafter "DeBarros"), to pack up his things and leave the building immediately. The plaintiff claims he was shocked by the directive and that someone witnessing this occurrence could well think that he was associated with some criminal wrongdoing. The point is underscored by the fact that no employee had ever similarly been escorted out of the credit union prior to this instance.

The evidence is sufficient to raise genuine issues of material fact as to whether First Citizens and Silva defamed Simas. Board Chairman Ed Harrington, DeBarros and Silva "made the resignation effective immediately, and directed that Simas be escorted from the credit union premises in full view of his coworkers, several of whom questioned him about the reason for the unprecedented treatment." *Simas*, 170 F.3d at 43. While escorting an employee from the building by itself may not rise to the level of defamation, when such a move is unprecedented the inference could be made that criminal wrongdoing was involved. Furthermore, given the purported maltreatments Simas suffered allegedly in retaliation for his whistleblowing, a finder of fact could also conclude that Silva's decision to have Simas escorted from the premises demonstrated malice, which would negate any conditional privilege Silva might have enjoyed. *See Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.*, 24 Mass.App.Ct. 217, 223, 508 N.E.2d 113, 117, *rev. denied*, 400 Mass. 1104, 511 N.E.2d 620 (1987)("Malice, which destroys the defense of privilege, must be taken to mean that the defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive.").

■ With regard to the second time the plaintiff was allegedly defamed, Silva's statement to the NCUA that Simas was a "disgrunted [sic] employee" quite simply does not rise to the level of actionable conduct, but rather comes closest to a statement of opinion. To be sure, Silva, in a deposition given after the letter was issued, defined the word disgruntled to include "one who might come into work and shoot his fellow workers." *Simas*, 170 F.3d at 43. However, as explained by the Supreme Court, the relevant question is "whether a reasonable factfinder could conclude that the statements [. . .] imply an assertion [of fact]." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). "Disgruntled" is a word that is vague, imprecise, and subject to numerous interpretations. *See Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1 Cir., 1992); *see also Bander*, 313 Mass. at 346, 47 N.E.2d at 601 ("a word of 'general disparagement' equally discreditable as applied to all persons and not peculiarly harmful in a financial way to" a person in a particular profession is not slanderous.).

■ Even assuming *arguendo* that the term "disgruntled" could be viewed as defamatory, Silva would not be liable in tort because she is entitled to the protection of a conditional privilege.

> An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job.

*Thomas v. Sears, Roebuck & Co.*, 144 F.3d 31, 34 (1 Cir., 1998) (quoting *McCone v. New England Tel. & Tel. Co.*, 393 Mass. 231, 235, 471 N.E.2d 47, 51 (1984) (quoting *Bratt v. International Bus. Machines Corp.*, 392 Mass. 508, 509, 467 N.E.2d 126, 129 (1984))).

In this case, Silva had a legitimate interest in disclosing potentially defamatory infor-

mation about Simas to the NCUA. First Citizens was legally required to "notify [the] NCUA in writing of any proposed changes in its [...] executive staff" of which Simas was a part. 12 C.F.R. § 701.14(a), (b)(2). Additionally, "the notice [that the credit union must file announcing the change in its officers had to] contain information pertaining to the competence, experience, character, or integrity of the individual with respect to whom the notice is submitted [....]" 12 C.F.R. § 701.14(d)(1). Silva's use of the word disgruntled, whether opinion or fact, was within the spirit and letter of the particular federal regulation governing federal credit unions.

In Count VI, Simas claims that Silva, knowing of the advantageous relationship that existed between him and First Citizens, improperly interfered with that relationship such that he lost the economic benefit he enjoyed with First Citizens. Although the defendant concedes that the plaintiff had an economic relationship with First Citizens and that she knew of it, Silva contends that there is insufficient evidence to support a finding that "he lost his position as a result of improper motive or means" by virtue of Silva's conduct. Furthermore, Silva reiterates her argument that since in her view Simas resigned—as opposed to being terminated—he did not suffer any harm.

■ For Simas to succeed on a claim of tortious interference with an advantageous relationship, he must show (1) a business relationship existed; (2) Silva knew of such relationship; (3) Silva intentionally and improperly interfered with that relationship; and (4) Simas suffered a loss as a result of that interference. *See Lynch v. City of Boston,* 180 F.3d 1, 19 (1 Cir., 1999); *Chakrabarti v. Cohen,* 31 F.3d 1, 4 (1 Cir., 1994); *Wright,* 412 Mass. at 476, 589 N.E.2d at 1245; *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363, 1369 (1991); *United Truck Leasing Corp. v. Geltman,* 406

Mass. 811, 814–16, 551 N.E.2d 20, 22–3 (1990).

■ In *Geltman,* the Supreme Judicial Court rejected the need for a plaintiff to show malice and replaced the threshold with "improper." *Geltman,* 406 Mass. at 812–16, 551 N.E.2d at 21–3. Four years later improper motive was interpreted to include "actual malice" in *King,* 418 Mass. at 587, 638 N.E.2d at 495, thereby creating confusion about what a plaintiff must prove to prevail on a tortious interference claim. However, in the same year as *King,* the SJC also held that "it was error to include malice in the judge's instruction and on the verdict form" for a tortious interference claim. *Draghetti v. Chmielewski,* 416 Mass. 808, 819, n. 13, 626 N.E.2d 862, 870 (1994); *see also Masso v. United Parcel Service of America, Inc.,* 884 F.Supp. 610, 620–21 (D.Mass., 1995); *Birbiglia v. Saint Vincent Hospital, Inc.,* 427 Mass. 80, 83, 692 N.E.2d 9, 12 (1998) (court let stand lower court ruling using improper interference language.).

Applying these legal principles, Simas must therefore show that Silva interfered improperly with the business relationship he had with First Citizens. The Massachusetts Appeals Court has provided guidance on what may constitute such interference. In an employment setting, if an individual is harassed by a third-party through

(a) constant detailed direction of [the individual] and [that individual's] subordinates although [the third-party] was not directly in authority over [the individual]; (b) continual interference with her performance of her duties which prevented [her] from performing her job properly; (c) verbally harassing and intimidating [the individual] and causing her to reasonably fear that her job was in jeopardy; and (d) making unreasonable demands as to the hours [the individual] was to work and time she was allowed to take for vacation, threatening that if she did not comply her job was in jeopardy.

*Catalano v. First Essex Sav. Bank,* 37 Mass.App.Ct. 377, 381, 639 N.E.2d 1113, 1116–17, *rev. denied,* 419 Mass. 1101, 644 N.E.2d 225 (1994).

The First Circuit's view of the facts of this case is instructive, for example,

'In her October 8, 1993 memo, Silva not only complained that Simas had harassed the internal auditor, but stated directly to Simas that the charges he made about the Xifiras (sic) loan were "unwarranted," and that if he persisted in making unwarranted charges or threats [to report his suspicions to the NCUA],' he would be terminated immediately.

\* \* \* \* \* \*

The term 'making unsubstantiated charges,' as employed in the Silva memo, is amply expansive to encompass Simas' report to the NCUA, and Silva's express intentions to terminate Simas likewise bespeaks a premeditated plan to punish him for the same activity. [. . .] [A] jury reasonably could conclude that the sole intendment of her October 8 memo was to prevent Silva's regulatory violations from coming to the attention of the appropriate federal authorities.

*Simas,* 170 F.3d at 48.

It was also observed, inter alia, that "Silva also refused to consider Simas' request for promotion to a vacant vice-presidency, removed him as network administrator, denied him permission to attend a business-related seminar, and refused his request for a cellular phone." *Id.* at 42. Such conduct as described by the First Circuit in *Simas* would seem to fall readily within the realm of that detailed in *Catalano.* Certainly the evidence suffices to raise genuine issues of material fact as to whether Silva intentionally and improperly interfered with the advantageous relationship.

---

8. A separate Order shall enter granting summary judgment on those claims as to which

Next it must shown that Simas was harmed by Silva's improper interference. As has already been discussed at some length, the plaintiff alleges that he was constructively discharged from his employment, a view of the facts not shared by the defendant. If Simas proves his theory, however, he will have simultaneously proven the requisite harm.

### IV. Conclusion and Order

For the reasons stated, it is ORDERED that Defendant First Citizens' Federal Credit Union's Motion for Summary Judgment be, and the same hereby is, DENIED as to Count I (wrongful termination) and Count II (defamation). It is FURTHER ORDERED that Defendant Barbara M.W. Silva's Motion for Summary Judgment be, and the same hereby is, DENIED as to Count II (defamation) and Count VI (tortious interference with an advantageous relationship).[8]

plaintiff does not oppose the entry of summary judgment.