MICHAEL PHELAN *vs.* THE MAY DEPARTMENT STORES
COMPANY & others.[1]

No. 02-P-720.

Suffolk. December 2, 2003. - April 21, 2004.

Present: LENK, KAFKER, & MILLS, JJ.

Further appellate review granted, 442 Mass. 1101 (2004).

*False Imprisonment. Libel and Slander. Practice, Civil,* Judgment notwith-
standing verdict.

In a civil action brought against the plaintiff's former employer and two of his
supervisors for false imprisonment of the plaintiff and defamation, the
judge erred in granting judgment notwithstanding the verdict on the
defamation claim in favor of the defendants, where the defendants' conduct
in keeping and escorting the plaintiff under guard for more than six hours
and falsely imprisoning him was, under the circumstances, communicative
of criminal wrongdoing and amounted to a statement for purposes of the
plaintiff's defamation claim [847-849]; where the plaintiff's testimony that
his coworkers witnessed the repeated escorts and imprisonment was not
too remote to raise the inference that the conduct had defamatory meaning
to those who witnessed it, even in the absence of testimony by such wit-
nesses [849-850]; and where the jury were warranted in concluding that
the defendants' conduct went recklessly beyond anything that was neces-
sary to protect the employer's legitimate business interest [850-851].

CIVIL ACTION commenced in the Superior Court Department on
September 14, 1998.

The case was tried before *Elizabeth M. Fahey,* J., and a mo-
tion for judgment notwithstanding the verdict was heard by her.

*Richard D. Glovsky* for the plaintiff.

*Michael S. Appel* for the defendants.

MILLS, J. The plaintiff Michael Phelan complained against his
former employer and superiors, the defendants May Department
Stores Company, Michael Geraghty, and Donald Lane, alleging
false imprisonment and defamation arising from their conduct

[1]Michael Geraghty and Donald Lane.

on July 10, 1998. A jury found for the plaintiff and awarded damages of $1,500 for false imprisonment and $75,000 for defamation. The judge allowed the defendants' motion for judgment notwithstanding the verdict (judgment n.o.v.) on the defamation claim, concluding that the plaintiff had failed to overcome the defendants' conditional privilege and "doubt-[ing]" that the plaintiff had set forth sufficient evidence of publication. The plaintiff appeals the judgment n.o.v., asserting that the judge erred by substituting her judgment for that of the jury. We agree and reverse.

1. *Standard of review.* Judgment notwithstanding the verdict is to be granted cautiously and sparingly, *Netherwood* v. *American Fedn. of State, County & Mun. Employees, Local 1725*, 53 Mass. App. Ct. 11, 20 (2001), and a judge shall not substitute her opinion for that of the jury if the verdict was reasonably supported by competent evidence. The judge is not to weigh the credibility of the evidence, *McGaffigan* v. *Kennedy*, 302 Mass. 12, 14 (1938); *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 659 (1996), but rather to ascertain whether there was any evidence properly before the jury which reasonably could have led to the verdict. See *ibid.* Yet judgment n.o.v. may be warranted where an "essential element of [the prevailing party's] case rests upon a 'mere scintilla' of evidence," *Stapleton* v. *Macchi*, 401 Mass. 725, 728 (1988), quoting from *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 59 (1948), or if the judge determines as matter of law that there was an absence of evidence necessary to make out a cause of action.[2] In reviewing the judgment, we consider the facts and inferences therefrom in the light most favorable to the plaintiff to determine if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Stapleton* v. *Macchi, supra.* In reviewing a judgment n.o.v., we

---

[2]If the defense moves for a directed verdict, and the trial judge thinks resolution of the matter is on the tipping point, it is sound practice to deny the motion and to give the case to the jury, which may render the question academic by returning a verdict for the defendant. If the jury finds for the plaintiff, the trial judge may, upon a motion for judgment n.o.v., reconsider and decide the issue previously presented by the motion for a directed verdict. *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978).

need not defer to the judge's discretion, but instead we "examine the case anew, following the same standard the judge is obliged to apply." *MacCormack* v. *Boston Edison Co.*, *supra*.

2. *Background.* Based on testimony at trial, the jury were entitled to find the following. In July of 1998, Phelan, an accountant, was employed as assistant director of accounts payable for Filene's, a division of the May Department Stores Company. Despite knowing of prior fiscal problems arising from similar practices, Phelan's superior, Michael Geraghty,[3] directed him in 1997 to pay "prior year invoices" (PYIs) from a fund known as the vendor violations budget.[4] That budget held funds paid as penalty by any vendor that Filene's had initially determined to have violated its delivery or other policies, pending refund of the penalty upon the vendor's successful showing that it had not in fact committed the violation.[5] Phelan and his direct supervisor, Cathy Rooney, warned their superiors (Geraghty and Donald Lane) that this practice would likely backfire, both obstructing timely repayment to deserving vendors and preventing the meeting of budget goals. Nevertheless, Phelan and Rooney's superiors never instructed them to stop the practice.

During this time, Phelan's subordinate, Geoffrey Meade, was in charge of evaluating vendor correspondence to determine whether vendors were entitled to refunds. Without Phelan's knowledge, a backlog of the vendor correspondence developed in the hands of Meade. In early July of 1998, Meade finally told Phelan about the backlog, indicating that it was around $200,000 to $250,000. Phelan and Rooney promptly notified their next superior, Michael Basler. As it turned out, however, the problem was greater than Meade had initially let on. Meade subsequently

---

[3]Supervisory authority followed a hierarchy, such that Phelan reported to Cathy Rooney, who reported to Michael Basler, who reported to Donald Lane, who reported to Michael Geraghty, the chief financial officer.

[4]Both Donald Lane and Geraghty acknowledged that severe problems had previously resulted from this practice, and Lane acknowledged that new problems would be considered their responsibility and would reflect negatively upon them.

[5]That budget was also intended to contribute to the annual budget of Filene's by netting amounts equivalent to .27 per cent of sales in 1997 and .32 per cent of sales in 1998.

bypassed Phelan and Rooney, reporting to Basler that the backlogs and unpaid PYIs approximated $500,000. Meade then attempted to discard the backlog paperwork in a recycling bin, but later informed the auditors in time to retrieve it.

Phelan's superiors (Lane, Geraghty, and Basler) began investigating the matter with the help of two auditors. Beginning on July 9, numerous employees were summoned to Lane's office, as was Phelan on the morning of July 10. What followed forms the crux of Phelan's complaint.

From Lane's office, Phelan was directed to Basler's office, because Lane was supposedly about to speak with Meade. Soon, however, Lane arrived in Basler's office with the head of security, Robert Buckley, and a Filene's security officer, Johnny Guante, who held Phelan under guard[6] for the next six to seven hours.[7] Although he wore no badge or other specific security indicia, Guante wore dark pants, black shoes, and a tie, all issued by Filene's and similar to the garb worn by other security guards there.

When Phelan asked to use the restroom, Guante escorted him there and even stood next to Phelan as he used the facilities. When he was thirsty, Guante followed directly behind him to the cafeteria where Phelan purchased a beverage. At least twice, Geraghty's secretary led Phelan, still under Guante's guard, through Filene's offices to other locations for holding. On each of these trips, they passed many of Phelan's coworkers who observed them together. On other occasions throughout the day, coworkers witnessed Phelan being held under guard in various offices and conference rooms. Finally, at the end of the day, Basler escorted Phelan back to Lane's office, where, in the presence of Rooney among others, he was suspended pending the completion of the investigation. Phelan was escorted from the building, and his employment was subsequently terminated. The auditors never interviewed Phelan directly, and Phelan's own supervisor, who was not herself under investigation, played no

---

[6]Lane told Buckley, "Don't let him use the phone or leave." After Buckley and Lane left the room, Guante positioned himself in a chair inches from the open door. Later in the day, Guante prevented Phelan from calling his wife.

[7]The jury found that Phelan was in fact falsely imprisoned during the course of his holding, a result not challenged by the defendants on appeal.

role in investigating Phelan, even though she could have corroborated his story.

Despite contrary evidence, the jury could have fully credited Phelan's testimony and reasonably inferred that, among other things: (1) employees in Filene's offices were aware that an investigation of financial wrongdoing was occurring on July 9 and 10, given that many people had been summoned to Lane's office and questioned; (2) Phelan's coworkers were aware that he was being held under guard throughout the day, given that they likely recognized Guante as a security guard when he escorted Phelan to the restroom, to the cafeteria, and from one office to another, and that they witnessed him being held in offices and other locations; (3) Phelan's coworkers would have reasonably inferred he was being accused by his superiors of criminal wrongdoing in the circumstances; (4) even if Phelan's conduct warranted termination, it was not criminal, and thus any imputation of crime was false; (5) it was unreasonable and unnecessary for the defendants to hold Phelan for so long, to keep him under guard, and to allow his coworkers to witness him being so closely guarded for so long.

3. *Discussion.* To prove defamation, a plaintiff must show that the defendants published an unprivileged, false, and defamatory statement concerning the plaintiff, which "ridicule[d] or treat[ed] the plaintiff with contempt." *Correllas* v. *Viveiros*, 410 Mass. 314, 319 (1991). See *Ellis* v. *Safety Ins. Co.*, 41 Mass. App. Ct. 630, 635 (1996). A false statement that "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community," is defamatory, *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975), and imputation of a crime is defamatory per se, in that it requires no proof of special damage. *Lynch* v. *Lyons*, 303 Mass. 116, 118-119 (1939). The statement must be communicated to at least one person other than the plaintiff to satisfy the publication requirement. *Brauer* v. *Globe Newspaper Co.*, 351 Mass. 53, 56 (1966).

A. *The defamatory statement.*

It is first a question for the judge whether a particular statement is reasonably susceptible of defamatory meaning. *Ellis* v. *Safety Ins. Co.*, *supra*, citing *Foley* v. *Lowell Sun Publishing*

*Co.*, 404 Mass. 9, 11 (1989). In this case, the judge's threshold inquiry required her to consider whether physical conduct alone could amount to a defamatory statement and whether this particular conduct could reasonably be considered to have defamatory meaning. The claimed defamation here was not by written or spoken word, but is asserted to have been by communicative physical conduct, i.e., the act of keeping and escorting Phelan under guard for more than six hours and, as the jury found, falsely imprisoning him. Such conduct could not be deemed a defamatory statement in a vacuum, but in this case Phelan's coworkers witnessed it. The judge ruled "that under limited circumstances, viewed in . . . context, conduct, including that mentioned in this case, could constitute a defamatory publication." We agree that the defendants' conduct in this case, interpreted in the light most favorable to the plaintiff, is communicative of criminal wrongdoing and amounts to a statement for purposes of Phelan's defamation claim.[8]

One and one-half centuries ago, the Supreme Judicial Court recognized that a gesture may be deemed a statement for purposes of setting forth a claim of defamation by slander. See *Leonard* v. *Allen*, 11 Cush. 241, 244-245 (1853). Likewise, the Restatement (Second) of Torts states that slander, although generally consisting of spoken words, may consist of "transitory gestures or . . . any form of communication other than [libel]." Restatement (Second) of Torts § 568(2) (1977). Federal courts have also interpreted Massachusetts law to recognize defamation by conduct. See *Simas* v. *First Citizens' Fed. Credit Union*, 63 F. Supp. 2d 110, 117 (D. Mass. 1999) ("While escorting an employee from the building by itself may not rise to the level of defamation, when such a move is unprecedented the inference could be made that criminal wrongdoing was

---

[8]Although the falsity of the statement may have been an issue at trial, the judge did not address truth or falsity in her judgment n.o.v. order, and the parties have not directly addressed the question in their briefs or arguments. Essentially, the defendants stand by their investigation of the matter and their termination of Phelan, yet they do not now assert any criminal conduct. With this in mind, we take the view that it was false to impute a crime to Phelan, regardless of whether he was responsible for accounting problems in his department.

involved").[9] Accordingly, whether the statement evidenced by the conduct in this case was defamatory was a matter properly to be left to the jury.

B. *The publication.*

The judge indicated and the defendants now assert that the jury could not have found publication without evidence *from someone other than the plaintiff* that a third party perceived the conduct to be defamatory. In *Leonard* v. *Allen, supra,* the court wrote, "[w]hen the charge is made by gestures and signs, and not solely in words, it is the more necessary to allow a departure from the strict rule . . . of refusing to permit a witness to state what meaning he understood the defendant to convey by the words used." In other words, it may be helpful to hear from witnesses what they saw and what they thought the allegedly defamatory conduct or gesture meant. However, such testimony is not mandated. In fact, it is sufficient for the plaintiff to produce circumstantial evidence from which the jury could reasonably infer that the statement, or in this case the conduct, was of defamatory significance to others. See *Sharratt* v. *Housing Innovations, Inc.,* 365 Mass. 141, 145 (1974) ("attendant circumstances may be shown as proof of the defamatory nature of the words").

Despite the defendants' oral argument to the contrary, there is no rule that a plaintiff's testimony without corroboration is incompetent to set forth such circumstances. The present case is distinguishable from *Doane* v. *Grew,* 220 Mass. 171, 180-181 (1915), relied on by the defendants, a slander case where the court determined that certain evidence (that third parties denied the plaintiff employment after she referred them to the defendant, her former employer) was improperly admitted in that it was too remote to raise an inference of the defendant's state of mind toward the plaintiff. In this case, Phelan's testimony that his coworkers witnessed the repeated escorts and

[9]See Note, Beyond Words: The Potential Expansion of Defamation by Conduct in Massachusetts, 83 B.U. L. Rev. 619 (2003), for a comprehensive review of various States' treatment of the question of defamation by conduct and for a particularly helpful analysis of cases in the United States Court of Appeals for the First Circuit and the Federal District Court for the District of Massachusetts, where those courts supposed how Massachusetts courts would decide defamation-by-conduct cases involving the dismissal of employees.

imprisonment by the defendants bears on publication, not merely on the defendants' state of mind. Particularly in light of the totality of the circumstances, i.e., where an investigation was being conducted over multiple days and the plaintiff was falsely imprisoned and escorted through the office over many hours, this evidence was not too remote to raise the inference that the conduct had defamatory meaning to those who witnessed it, even in the absence of testimony by such witnesses.[10]

C. *Abuse of the conditional privilege.*

Supervisors, executives, and corporate officers are conditionally privileged to publish defamatory material that "is reasonably related to the employer's legitimate business interest." *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 558 (2003), quoting from *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 95 (1987). However, one way the conditional privilege is lost is if the defendant recklessly publishes the material "unnecessarily, unreasonably, or excessively." *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. at 558.

The jury were warranted in finding that the defendants here recklessly overpublished their defamatory statements about Phelan by holding him under guard for more than six hours and repeatedly escorting him through the office in view of his coworkers. The defendants' conduct surpassed the "[s]imple negligence, want of sound judgment, or hasty action" that would not amount to an abuse of the privilege. *Dexter's Hearthside Restaurant, Inc.* v. *Whitehall Co.*, 24 Mass. App. Ct. 217, 223 (1987) (holding that defendant's conduct was at most a mistake). That the defendants permitted Phelan's coworkers to witness their prolonged conduct, which constituted no less than false imprisonment, certainly permits a finding that they were reckless in excessively and unnecessarily imputing to him a crime.[11] Quite simply, the jury were warranted in concluding that the

---

[10]In any event, Phelan's testimony was not the only evidence of the circumstances giving rise to the inference. Guante testified that "a ton of people" witnessed them walking together. Meade also testified to seeing Phelan in the hallway with Guante, although he claimed not to recognize Guante as a security guard. Likewise, Lane testified to seeing Phelan and Guante traveling the hallways to and from the restroom.

[11]Were the publication not as excessive as here, we would need to consider whether the jury could have reasonably found that the defendant knew the

defendants' conduct went recklessly beyond anything that was necessary to protect the store's legitimate interest.

So much of the judgment notwithstanding the verdict as resolved the defamation claim in favor of the defendants is reversed. The case is remanded for judgment to enter on the jury's verdict for the plaintiff on the defamation claim.

*So ordered.*

---

information to be false or had no reason to believe it to be true. *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. at 558. Our decision today should not be read to hold that *any* publication of an employer's suspicion of employee wrongdoing would amount to actionable defamation, but only that the reckless overpublication here may properly be deemed by a jury to be defamatory and not privileged.