NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-845                                          Appeals Court


RONALD F. NARDONE  vs.  LVI SERVICES, INC.


No. 17-P-845.

Middlesex.     April 12, 2018. - October 29, 2018.

Present:  Rubin, Sacks, & Singh, JJ.


Contract, Promissory estoppel.  Damages, Quantum meruit.
     Practice, Civil, Judgment notwithstanding verdict.



     Civil action commenced in the Superior Court Department on
November 14, 2011.

     The case was tried before Bruce R. Henry, J., and motions
for judgment notwithstanding the verdict and for a new trial or
remittitur were considered by him.


     William J. Royal, Jr. for the plaintiff.
     Matthew A. Porter for the defendant.


     RUBIN, J.  Plaintiff Ronald Nardone brought suit against

his former employer, LVI Services, Inc. (LVI), for breach of

contract, promissory estoppel, and quantum meruit.[1]  A jury found

_____

     [1] The jury also found LVI not liable for unpaid commissions,
and the judge granted summary judgment in favor of LVI on counts

LVI not liable for breach of contract, but liable for $800,000 on the promissory estoppel claim and $200,000 on the quantum meruit claim.  Following trial, a judge of the Superior Court granted LVI's motion for judgment notwithstanding the verdict on the promissory estoppel and quantum meruit claims.  Nardone appeals from this decision, and we reverse.

Facts.  "In reviewing [a] judgment [notwithstanding the verdict], we consider the facts and inferences therefrom in the light most favorable to the plaintiff to determine if 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'"  Phelan v. May Dep't Stores Co., 60 Mass. App. Ct. 843, 844 (2004), quoting Stapleton v. Macchi, 401 Mass. 725, 728 (1988).  Viewed in that light, the jury could have found the following.

Nardone began working for LVI, an environmental remediation company, in 1988, as the director of sales and marketing for its Boston branch.  He was promoted to president of the branch in 1989 and then to corporate vice-president of business

_____

alleging age discrimination, breach of the covenant of good faith and fair dealing, and unpaid commissions owed anytime earlier than six years before the date the action was filed. Burton Fried, Paul Cutrone, Scott State, and David Pearson were also named as defendants, but all claims against them were dismissed before trial.  This appeal does not concern any of the claims mentioned in this footnote, or any claims against the noncorporate defendants.

development in 1990, a position he held until his departure from LVI in 2011. In his position as corporate vice-president of business development, Nardone was responsible for developing and maintaining relationships with clients, which included Fortune-100 companies. He also hired individuals, trained and managed salespeople, engaged in business development strategy, and regularly presented at senior management meetings.

In 1997, 2002, and 2005, LVI searched for investors to recapitalize the company in order to provide cash to fund its rapid growth. Nardone participated in each search by making "roadshow presentations," at which he, along with president and chief executive officer Burton Fried and chief financial officer Paul Cutrone, pitched the recapitalization to potential investors. It was disputed at trial whether making these presentations was part of Nardone's job, but, viewed in the light most favorable to Nardone, a reasonable juror could have concluded that it was not a required part: Nardone "wouldn't say [the roadshow presentations] were part of [his] job," he "would not classify [doing the roadshow presentations] as part of [his] job," he did not "believe it was part of [his] job description," and, in response to a question on cross-examination whether it was "part of the ordinary course of [his] duties and responsibilities to make these presentations; wasn't it?" Nardone responded, "I don't agree." And Fried testified that,

"I asked [Nardone] if he wanted to appear and give the presentation on behalf of the business development aspect of the business and he said yes.  He thanked me for inviting him.  I thought important to invite him. . . .  Although I didn't require him, he just accepted the invitation."  Nardone did not receive any compensation for his work on the roadshow presentations apart from his salary.  LVI obtained recapitalizations of approximately $24 million in 1997, $70 million in 2002, and $300 million in 2005.

As compensation for the 1997 recapitalization, members of senior management, including Nardone, received a combination of shares and stock options.  These stock options "expired worthless" because the company did not meet certain earning criteria that were necessary conditions for the options to vest.  Fried told Nardone that members of senior management would receive similar compensation -- shares and stock options -- for the 2002 recapitalization.

In August of 2005, after one of the roadshow presentations relating to the 2005 recapitalization, Nardone learned from Fried that a potential investor had offered to purchase stock options from option-holders at a rate of $1,400 per option.  Fried told Nardone that, once he went home and saw his stock option agreement, he would realize that he was "going to be a millionaire."  But, when Nardone got home, he discovered that he

had no stock options.  He relayed this information to Fried, who said, "That's impossible."  Nardone, Fried, and Cutrone then examined a list, maintained by Cutrone, of all the option-holders together with the number of options they held.  The list contained approximately thirty people, but not Nardone: about twenty employees who did not own equity in the company, and all the management stockholders except Nardone.  Based on the number of stock options held by each management stockholder and the offer price, Nardone estimated that the average management stockholder would have received approximately one million dollars for his or her options.

After seeing the list, Nardone said to Fried, "[W]hat are we going to do about this, because if this isn't made right, I'm not going to continue with the roadshow; you can get someone else to do it; I'm finished; get Bob Katz (phonetic), Brian Messico, Dave Pearson; I don't care who, but I'm done."  Fried responded that this must have been a mistake, that he needed Nardone to "finish this process," and that, if Nardone continued with the roadshows, he would "make it right."

The next week, Fried contacted Nardone and told him that he had "found a way to make up for the oversight."  According to Fried, the offer to purchase the company included a cash bonus at closing, and Fried would be able to "make up for [his] oversight through that cash pool."  Although it was impossible

for Nardone to receive any new options, according to Fried, the cash bonus was a "perfect mechanism" to rectify the situation. Fried also told Nardone that the likelihood was "extremely high" that the company would receive the cash bonus, and that it would be in the millions. Nardone told Fried that, if Fried agreed to compensate Nardone through this mechanism, then he would continue to do roadshow presentations. Fried agreed, and Nardone made five or six more presentations.

After the recapitalization deal closed on November 15, 2005, Fried told Nardone that LVI did not receive a closing bonus, but that he had managed to get $50,000 for Nardone. Nardone grudgingly accepted the money and continued to work for LVI.

In February of 2008, though, Nardone came across a summary of the 2005 recapitalization deal that stated that LVI had, in fact, received a closing bonus of $7.95 million. Approximately $2 million had gone to Fried, $750,000 had gone to each of the chief operating officers, and $4 million had been distributed among other managers. Nardone brought this situation to the attention of Robert McNamara, who had succeeded Fried as president of the company. McNamara told Nardone, "You got screwed," and said he would try to make Nardone whole by giving him stock options that Nardone would be able to sell when the company went public. However, this did not transpire because

the 2008 financial crisis, which began shortly after Nardone's conversation with McNamara, foreclosed any possibility of an initial public offering.  Apart from the $50,000, Nardone never received what Fried had promised.

Discussion.  The jury found for the plaintiff Nardone on his promissory estoppel claim and on his claim in quantum meruit.  The trial court, however, allowed LVI's motion for judgment notwithstanding the verdict on both claims.

In order to succeed on such a motion, the defendant must show that, taking all the evidence and the reasonable inferences drawn therefrom in the light most favorable to the plaintiff, no reasonable juror could return a verdict for the plaintiff.  See Phelan, 60 Mass. App. Ct. at 844.  Our review of the allowance of such a motion is de novo, id. at 845, and consequently we, too, employ this high bar.

1.  Promissory estoppel.  In the judge's order allowing the motion for judgment notwithstanding the verdict on the promissory estoppel claim, the judge concluded that the proof before the jury was inadequate to establish either that the plaintiff was induced to act in reliance on a promise of the defendant or that he suffered a detriment as a result of relying

on the promise of the defendant.[2]  The judge first concluded that "participation in the investor presentations was part of the plaintiff's job."  And that meant, the judge held, that he was "not induced to participate in those presentations by the defendant's promises."

In assessing a motion for judgment notwithstanding the verdict the judge is required to view the evidence in the light most favorable to the plaintiff.  See Phelan, 60 Mass. App. Ct. at 844.  After all, the jury is the finder of fact and unless the evidence was insufficient to support a finding necessary for the judgment it is not the role of the trial judge to second guess the jury's factual findings.

In this case, the evidence was sufficient to allow the jury to find that although the defendant was not compensated for his "roadshow" presentations on top of his usual salary, neither were they required as part of this job.  Although the trial judge asserted that the plaintiff testified that the road shows were part of his job responsibilities, fairly read his testimony was far more nuanced than that.  The jury may view the evidence

---

[2] "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission."  Sullivan v. Chief Justice for Admin. and Mgt. of the Trial Court, 448 Mass. 15, 27-28 (2006) (citation omitted).

as a whole, and the plaintiff testified that he "wouldn't say [the roadshow presentations] were part of [his] job," he "would not classify [doing the roadshow presentations] as part of [his] job," and he did not "believe it was part of [his] job description." In light of all this, the jury could have concluded that his statement that all of his work in connection with the roadshows "was done while [he was] a salaried employee of LVI," on which the defendant before us relies, was merely a statement that he received no further compensation for doing the roadshows although they were not a required part of his job. Nor is a statement that Nardone made in his affidavit on which the defendant also relies inconsistent with this. He said: "In the ordinary course of my duties and responsibilities as an executive, as [s]enior [v]ice [p]resident of [b]usiness [d]evelopment at [d]efendant, LVI, I was well aware of the corporate actions of LVI and the status of LVI's efforts to market to potential investors and LVI in connection with the 1997, 2002, and 2005 [r]ecapitalizations of LVI, and was very involved in the marketing, presentations, due diligence, and related in the recapitalizations, including the 2005 [r]ecapitalization with Code Hennessy." Even if this is read to mean that he did the presentations as part of his job, and it is ambiguous on the point, the jury were still free to find that he

was not <u>required</u> to do so.  Indeed, Burton Fried testified that "I didn't not require him, he just accepted the invitation."

In light of all the evidence, the jury were entitled to conclude that the roadshows were not a required part of the plaintiff's job responsibilities, that he could have declined to continue doing them, and that he threatened to do so.

If doing these presentations were not a required part of Nardone's job responsibilities such that he could decline to continue doing them -- even if, when he did them, he did them as part of his job -- the jury were also free to find that LVI's unkept promise nonetheless induced him to make the subsequent roadshow presentations once he concluded that he had been treated unfairly and that, if his concerns were not addressed, he would stop making the presentations.  Indeed, it is obvious on the face of it that the promises made here and found by the jury were precisely intended to induce the plaintiff to make the subsequent roadshow presentations.  And neither is the fact that Nardone did the presentations in the past dispositive of whether Fried's promise constituted an inducement.  It would be inconsistent with the equitable nature of the doctrine of promissory estoppel to say that a promise that was intended to induce voluntary action, and that did, in fact, induce that action, did not, as a matter of law do so, simply because at an earlier time, the plaintiff would have done that action without

that promise.  Given the facts that could have been found by the jury about the precise way in which doing the presentations was and was not "part of" Nardone's job, the trial judge's conclusion that the jury could not have found that the promise induced any action by the plaintiff is in error.

The judge's second conclusion with respect to the promissory estoppel claim was that any action or failure to act by the plaintiff in reliance on the promise made to him was not "detrimental."  The judge's analysis in full, was that "the plaintiff failed to show that he was caused to forego some other employment opportunity . . . because he relied on the promised payment."

This views too narrowly the nature of the equitable doctrine of promissory estoppel.  As an equitable doctrine, promissory estoppel is concerned with any detrimental change in position, not only with economic detriment.  Indeed, before us, LVI does not suggest that only economic detriment may give rise to a promissory estoppel claim, and rightly so: the Supreme Judicial Court has found detriment in forbearance from filing a lawsuit, regardless of whether it would have been successful, Sullivan v. Chief Justice for Admin. and Mgt. of the Trial Court, 448 Mass. 15, 27-30 (2006), and other cases have found detriment in giving up the right to do something one is legally entitled to do.  See, e.g., LeMaitre v. Massachusetts Turnpike

Auth., 452 Mass. 753, 755 n.2 (2008) (plaintiff remained in job based on rate of benefits promised in defendant's employee manual). A party can rely on a promise to his or her detriment without showing that he or she forewent some other economic opportunity.

Before us, LVI argues instead that "merely remaining employed cannot constitute the detrimental reliance required for a promissory estoppel claim." In this, LVI relies primarily on our recent decision in Suominen v. Goodman Indus. Equities Mgt. Group, LLC, 78 Mass. App. Ct. 723 (2011), in which we held that "continued employment alone" is not sufficient to establish detrimental reliance as a matter of law -- that a reasonable juror could find that a person who continued in his or her employment did not suffer the required detriment. Id. at 732 n.11. But this is not relevant to the heart of plaintiff's claim here: that he suffered a legal detriment by doing further roadshow presentations, which were not a required part of his job responsibilities and that he otherwise would not have done, presentations that were intentionally induced by the defendant's promise and that were for its benefit. In fact, Suominen also held that a jury could find the requisite detriment in a plaintiff working harder in his or her position in reliance on a promise -- what is required is something more than continuing employment simpliciter. See id. at 734. This is analogous to

the detriment Nardone testified to here:  In reliance on Fried's promise to make him whole, Nardone agreed to do more roadshow presentations than he otherwise would have or was required to do as part of his job.  Therefore, although they were not required to do so, a jury could have found that Nardone suffered the requisite detriment, and a judgment notwithstanding the verdict in favor of the defendant on this basis was inappropriate.[3]

2.  Quantum meruit.  "To achieve recovery upon the theory of quantum meruit, the claimant must prove (1) that it conferred a measurable benefit upon the defendants; (2) that the claimant reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." Finard & Co., LLC v. Sitt Asset Mgt., 79 Mass. App. Ct. 226, 229 (2011).  The plaintiff argues, and apparently the jury found, that he conferred a benefit upon the defendant by continuing the

_____

[3] The defendant would also rely on Hall v. Horizon House Microwave, Inc., 24 Mass. App. Ct. 84 (1987), which, it contends stands for the proposition that a party cannot show detriment merely by continuing in one's employment.  For the reasons given above, we need not dwell on this point.  To the extent the defendant reads Hall as holding that a party must show economic loss if he is to demonstrate that remaining in a job that he otherwise would not have due to a promise amounts to detriment, we disagree with its reading.  As explained in Suominen, 78 Mass. App. Ct. at 734, the "type of detriment" at issue in that case -- like the type of detriment at issue here -- "was not discussed in Hall."  In any event, even if the holding of Hall were as the defendant contends, it was superseded by the Supreme Judicial Court's subsequent opinion in Sullivan.

roadshow presentations, that Fried's promise to make him whole in exchange for his continued participation in the roadshows created a reasonable expectation of compensation, and that LVI, through Fried, accepted the benefit knowing of the plaintiff's expectation.

The judge concluded, and the defendant argues on appeal, that "[t]here was no evidence that as a consequence of the defendant's promise he did anything that he was not already doing as part of the investor presentations. He did not take on some new obligation and the defendant did not receive some new benefit which it was not already entitled to receive." In other words, the judge concluded that, because doing the roadshow presentations was part of the plaintiff's job, his continuing to do them did not confer a measurable benefit on the defendant to which it was not already entitled. But since a reasonable juror could have found that doing the presentations was not a required part of Nardone's job, it equally could have found that his continuing to do them did confer a measurable benefit on LVI to which it was not already entitled. So this argument fails.

The defendant next argues that the evidence as a matter of law fails to establish that LVI had actual or chargeable knowledge of Nardone's expectation, or that either party reasonably expected LVI to pay Nardone for continuing to do the roadshow presentations. According the defendant, no such

expectation could exist because the roadshow presentations were part of his job, he had never been paid for them in the past, and "there was no evidence that circumstances had changed."

But of course the jury were entitled to find changed circumstances:  Nardone discovered that, as a result of an oversight, he had not received approximately one million dollars' worth of stock options, and he threatened to stop doing the roadshow presentations unless he was compensated, a threat to which Fried, on behalf of LVI, acceded.  A jury could have concluded that, while he had no reasonable expectation of being paid for the roadshow presentations in the past, Fried's promise that Nardone would receive compensation commensurate with the options he did not receive created a reasonable expectation he would be paid in the future.

The argument that the jury could not have found that LVI had actual knowledge of Nardone's expectation likewise fails. Fried, LVI's CEO, induced this expectation by promising to compensate Nardone through the cash bonus that was part of the 2005 recapitalization, so he clearly had knowledge of Nardone's expectation that he would be paid.  And, "knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation."  Demoulas v. Demoulas, 428 Mass. 555, 584 (1998), quoting Phoenix Sav. &

Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 250 (4th Cir. 1967).

Finally, the defendant argues that the jury's award of $200,000 on the quantum meruit claim lacks evidentiary basis. According to LVI, an award of $200,000 was disproportionate to Nardone's work because Nardone testified to performing only thirty-one hours of work on the roadshow presentations after Fried's promise. But this argument incorrectly presupposes that the measure of recovery in quantum meruit must be based on the hourly rate the promisee might have charged for the work. Indeed, we have held that "[t]he reasonable value of the services to the promisor, that is to say, the value of the benefit conferred upon the promisor, is the appropriate restitutional measure of damages." Slawsby v. Slawsby, 33 Mass. App. Ct. 465, 467 (1992) (emphasis added). And there is ample evidence of the enormous value of Nardone's work to the promisor, LVI. Fried agreed to pay Nardone the value of his lost stock options -- which the jury was told was one million dollars -- in exchange for his continuing the presentations. A reasonable juror could have concluded that, if the value of Nardone's work to LVI had been less than the value of Nardone's lost stock options, Fried would not have promised this. It would have been irrational to do so, doubtless out of character for a highly successful CEO like Fried. And, given that the

jury awarded Nardone $800,000 for promissory estoppel, awarding more than $200,000 on quantum meruit very well might have been duplicative. The $200,000 figure is however supported by the evidence.[4]

The order allowing the motion for judgment notwithstanding the verdict is reversed. The judgment dated May 9, 2017, is vacated. The judgment on jury verdict is reinstated.

So ordered.

---

[4] LVI does not argue that, if we reverse, a new trial is required, based on the judge's statement that, if he had not granted JNOV he would have ordered a new trial because the judgments were against the weight of the evidence. In any event, because the judge's "decision . . . on the motion for judgment notwithstanding the verdict points out the inadequacies which [he] found with the evidence regarding the promissory estoppel and quantum meruit claims," and that decision was infected by the legal errors we have described above, there is no basis for the judge to order a new trial. See Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 127 (1992) (decision to grant a new trial as against the weight of the evidence is reviewed for abuse of discretion, but a judge may exercise this discretion only "when the verdict 'is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice'"), quoting Scannell v. Boston Elevated Ry., 208 Mass. 513, 514 (1911).