HENRY C. SUOMINEN, JR. vs. GOODMAN INDUSTRIAL EQUITIES
MANAGEMENT GROUP, LLC, & others.[1]

No. 09-P-1896.

Suffolk. October 14, 2010. - February 11, 2011.

Present: LENK, SMITH, & MILKEY, JJ.

*Labor,* Wages, Failure to pay wages. *Contract,* Employment, Promissory
estoppel. *Practice, Civil,* Notice of appeal, Instructions to jury, Directed
verdict, Judgment notwithstanding verdict, Special verdict. *Joint and
Several Obligation.*

In a civil action, a Superior Court judge did not abuse her discretion in deny-
ing a motion to dismiss an appeal for failure timely to pay a docketing fee,
on the ground of excusable neglect by counsel. [730-731]
At the trial of a civil action alleging, inter alia, promissory estoppel, the judge
erred in declining to instruct the jury on the element of detriment; therefore,
the defendants were entitled to a new trial. [731-733]
At the trial of a civil action alleging, inter alia, promissory estoppel, the
defendants were not entitled to judgment in their favor as a matter of law,
and the judge did not err in denying the defendants' motion for judgment
notwithstanding the verdict, where the plaintiff presented sufficient evidence
of detriment to send the case to the jury. [733-734]
At the trial of a civil action alleging, inter alia, promissory estoppel, in which
neither the jury instructions on that claim nor the special questions on the
verdict form drew a distinction between the liability of the defendants (the
employer real estate development firm and its principal) and at which the
jury found for the plaintiff employee, the judge did not clearly err in his
implicit finding, under Mass.R.Civ.P. 49(a), that the employer's principal
was acting in a personal capacity when he made his promises to the
employee. [734-736]
At the trial of a civil action, the judge correctly dismissed the plaintiff em-
ployee's claim that the failure of the defendants (the employer real estate
development firm and its principal) to pay him amounts he claimed to be
owed as a share of the "promote" (i.e., a type of profit enjoyed by a real
estate developer) at the time he was fired constituted a violation of the Wage

---

[1]Steven E. Goodman was a codefendant. The following defendants were
joined solely on reach and apply claims: AG/GFI Winston-Salem, LLC; GFI
Commerce, LLC; GFI Merrimack, LLC; GFI Littleton, LLC; AG/GFI Hamp-
stead, Inc.; AG/GFI Duncan, LLC; AG/GFI Bradford, LLC; GFI Westminster
Square, LLC; GFI Ayer, LLC; GFI Milford, LLC; GFI Tyngsboro, LLC; GFI
Telluride, LLC; GFI Bedford, LLC; CB/GFI Salem, LLC; CB/GFI Littleton,
LLC; GFI Auburn, LLC; and AG/GFI Worcester, LLC.

Act, G. L. c. 149, § 148, where such promote payments were not commissions within the meaning of the Wage Act, regardless of whether they were due and payable at the time the plaintiff was fired. [737-738]

CIVIL ACTION commenced in the Superior Court Department on May 3, 2005.

The case was tried before *Ralph D. Gants*, J., and a motion to dismiss an appeal was heard by *Margaret R. Hinkle*, J.

*Ronald M. Jacobs* for the plaintiff.

*Tyler E. Chapman* for Goodman Industrial Equities Management Group, LLC, & another.

MILKEY, J. The plaintiff, Henry C. Suominen, Jr., was employed as the construction manager of defendant Goodman Industrial Equities Management Group, LLC (GIE), a small real estate development firm.[2] In that position, he enjoyed an annual salary of $225,000. After he was fired in 2004, Suominen filed an action against GIE and its principal, defendant Steven E. Goodman, alleging that Goodman had broken a promise to pay him certain compensation in addition to his salary. Following a seven-day trial in Superior Court, the jury ruled in Suominen's favor on some of his claims, including one based on promissory estoppel. The trial judge entered judgment awarding him a total of $1,729,243.01 in damages, the overwhelming bulk of which rested on the promissory estoppel claim. On appeal, the defendants argue that the trial judge should not have allowed that claim to go to the jury, and that, in any event, the judge's instructions on the claim were erroneous. Defendant Goodman also argues that there was insufficient basis for his being held personally liable. By way of cross appeal, Suominen claims that the trial judge erred in granting a directed verdict as to one of his other claims. He also argues that the defendants' appeal is not properly before us because of their failure — without sufficient excuse — to make timely payment of a docketing fee. We affirm in part and reverse in part. Specifically, we conclude that the judge correctly ruled on the directed verdict (and other) motions, but that a material omission in the jury instructions entitles the defendants to a new trial.

---

[2]By the time of trial, GIE, as such, no longer existed. By agreement, the judgment ran against GFI Management, LLC, GIE's successor, even though it was never formally joined as a party.

*Background.* 1. *The defendants' business.* Goodman is a real estate developer who focused on the redevelopment of existing, run-down industrial properties. Each targeted property was acquired by a deal-specific limited liability company that Goodman created solely for that purpose (referred to at trial as a "deal company" or "deal entity").[3] Although the deal entity purchased the property, the actual redevelopment work there was done by GIE, the limited liability company that Goodman had set up as his over-all real estate management company. That work included rehabilitating the buildings for a new use, securing permits for that use, and the like. Some of the projects were sold after they were redeveloped, while others were retained.

2. *Suominen's hiring.* Suominen began working for Goodman as a consultant in February of 1999, and he became GIE's "construction manager" in June of that year. In that position, Suominen oversaw the day-to-day redevelopment work of many, but not all, of Goodman's projects. His initial starting salary at GIE was $100,000, which was $35,000 less than his most recent prior job. He was willing to accept the reduced salary because of the potential that he could share in the "upside" of the projects on which he worked. Before Suominen had been hired, Goodman had committed to working out some kind of profit-sharing plan with him, although the details of such a scheme had not been resolved before Suominen started work.

3. *The parties' negotiations.* By the end of 1999, the parties were well along toward working out such profit-sharing details, with the discussions having evolved in the context of the specific development projects on which Suominen was working at the time. In fact, by January of 2000, the discussions had progressed to the point that Goodman directed his lawyer to draft "equity sharing agreements" for these projects. Under those drafts, Suominen and David Heller, GIE's chief financial officer, were to receive a percentage of the "promote" that each of the projects realized (if any). As the testimony at trial revealed, "promote" (also known as a "promoted interest") is a term of art used in the real estate development field. It refers to a species of profit that developers can enjoy — in addition to the return on any

---

[3] Suominen sued seventeen of these deal entities as reach and apply defendants. See note 1, *supra.*

equity they invested — if their projects become extremely successful. What portion of profit, if any, is to go to the developer as a "promote" is determined by agreement between the developer and investors at the start of a development deal.[4] Not every real estate development deal is structured so as to include a "promote"; in some cases, a developer's potential profit comes only from return on equity or the payment of a separate "development fee."

In the January, 2000, drafts, the precise percentage of the promote that was to go to Suominen was left blank. Shortly thereafter, however, Goodman informed Suominen that he was willing to part with thirty-five percent of his promote, and that he did not care how Suominen and Heller split it. Suominen and Heller quickly agreed between themselves that Suominen should take two-thirds of their joint share, or a resulting 23.33% of the over-all promote. Suominen reported this back to Goodman, and they had what Suominen variously characterized as a "nod of the head," a "handshake round," and a "semi-congratulatory type of thing." At this point (early 2000), Suominen believed he had reached a full agreement under which he would receive a 23.33% share of the promote that otherwise would have gone to Goodman. He viewed his promised share of the promote, and not his salary, as his "primary expectation of compensation," and he testified that he "would have left" his employment had he learned that his understanding of what he was to receive was incorrect.

At the end of 2000, Suominen had the 23.33% figure inserted into the draft documents for two then-current projects. He also modified the documents in a few other respects. For example, he added his own signature line, and he inserted a provision

---

[4]The parties' Winston-Salem development, which involved an abandoned brewery that was converted into a distribution center and then sold, provides an illustrative example. The property was purchased by one of the deal entities that Goodman had established. Goodman provided a five percent share of the equity funding for the project, and a group of outside investors provided the remainder. The agreement under which the deal entity operated spelled out how any profits generated by the project would be distributed. Generally speaking, the profits were to be paid to the investors (including Goodman) based on their share of the equity. However, once all the investors had achieved a designated rate of return on their equity (fifteen percent), a specific share of the additional profits (twenty-five percent) was to go to Goodman as the developer of the project (on top of the amount he would receive as an investor). That portion was defined as the project's "promote."

clarifying that the agreement would survive his termination or death. Suominen in fact signed his modified drafts, and he presented them to Goodman for his signature in December of 2000. Goodman declined to sign the documents, claiming that his doing so would require him to amend certain financial disclosure documents he had just filed. He confirmed with Suominen, however, that their deal was still on.

In March of 2001, Goodman's attorney forwarded to the parties a draft generic version of an equity sharing agreement that could be tailored for any specific deal (or at least those that were structured to include a promote). Moreover, the following month, Goodman acknowledged at a deposition in a separate action that Suominen and Heller had "an expectation when [Goodman did] a deal they'll get a part of it," and that they had an "interest" in thirty-five percent of the promote on particular projects.

Goodman never signed any equity sharing agreement with Suominen. In fact, his attorney testified that, at an unspecified time, Goodman informed him that he was no longer interested in pursuing such an agreement. According to the attorney, Goodman decided that such an arrangement was too constraining. However, Goodman never informed Suominen of his change in plan.

4. *The Milford distributions.* In April of 2001, Goodman refinanced property in Milford that one of his deal companies owned. This resulted in a large inflow of cash (presumably because the redevelopment work that had been done at the property added significant value). He had twenty-five percent of those proceeds invested in GIE, and in May of 2000, he had the remainder distributed to himself, Suominen, and Heller. Suominen was given 23.33% of the money distributed. On several later occasions, Goodman had operating profits from the Milford project distributed to himself, Suominen, and Heller. On those occasions, Suominen again received 23.33% of the distributions.

5. *The events of 2002 and 2003.* As a result of the Milford distributions, Suominen in 2001 earned approximately $60,000 above his baseline salary of $100,000. In 2002, however, there were no projects that had reached the point of generating distributions. Feeling strapped for cash, Suominen asked Goodman to raise his salary to $225,000, and Goodman agreed. In

2003, various projects were at the point of completion, prompting Heller, who as previously noted served as GIE's chief financial officer, to ask Suominen if his profit-sharing arrangement with Goodman was still in place. Suominen understood that it was, but no compensation above his increased salary was forthcoming even as deals began closing.

6. *Suominen's firing.* On March 18, 2004, Suominen and Goodman finally met to discuss Suominen's compensation. They testified to markedly different versions of the meeting. In Goodman's version, the meeting was primarily focused on concerns he claims to have had at the time regarding Suominen's performance. In Suominen's version, the meeting was primarily focused on the compensation that Goodman owed, with Goodman testing out various arguments about how the money might not be due. Shortly thereafter, Goodman had Heller draft a history of the equity sharing issues, which he had Heller backdate to make it appear as if the document had been drafted on January 1, 2003.

On July 12, 2004, Goodman fired Suominen at a face-to-face meeting. At the meeting, they discussed a transition period in which Suominen could continue to work on some of the existing projects, although not as an employee. Suominen did in fact continue to work under the belief that he would be compensated for such work as a consultant at the rate of his most recent annual salary. By electronic mail message (e-mail) sent on August 5, 2004, Goodman directed Suominen not to do any additional work, and he refused to pay Suominen for the work that Suominen had done after the date he had been fired.

7. *Suominen's claims and the jury's special verdict.* Suominen brought an action in Superior Court seeking damages both for the period that he was a salaried employee and for the brief period he worked as a consultant after being fired. Only the claims covering the former period remain live, and among those, the only ones still in play relate to Goodman's promise to pay Suominen a 23.33% share of the promote.[5] At trial, Suominen's principal theory of recovery was that he had entered into a

---

[5]On an unjust enrichment theory, the jury awarded Suominen $12,968 in damages for the work he performed after July 12, 2004 (with prejudgment interest, $18,237.14). The defendants do not challenge that portion of the judgment on appeal. The jury rejected Suominen's other claims related to his

binding contract for the promised compensation with both GIE and Goodman personally. The defendants argued to the jury that no such promise had ever been made, and that Goodman at most had led Suominen to believe that a discretionary bonus might come his way. The defendants also argued that, in any event, there was never a "meeting of the minds," because any agreement would have to be on a deal-specific basis (given that the amount of the promote, or even whether a deal included any promote, varied by the deal). They further argued that Goodman would never have agreed to give Suominen a set percentage of profits on those deals that made money, without Suominen having to share in the losses of those deals that lost money. For whatever reason, the jury rejected Suominen's contract claims.

However, the jury ruled in Suominen's favor on his fall-back theory of promissory estoppel.[6] Specifically, the jury answered "yes" to all of the following special verdict questions:

> "Did Goodman promise or represent to Suominen that he would receive 23.33 percent of the 'promote' on any development projects?
>
> ". . .
>
> "Did he make this promise or representation with the intent of inducing Suominen to continue his employment at GIE or with the reasonable expectation that it would induce him to continue such employment?
>
> ". . .
>
> "Did Suominen rely on this promise or representation by continuing his employment at GIE?
>
> ". . .
>
> "Did Suominen act reasonably in relying on this promise or representation?"

Over the defendants' protest, the jury were not separately asked

---

work as a consultant, as well as his claims for unreimbursed business expenses and unused vacation time while he was an employee.

[6]Suominen alleged other fall-back theories as well, but those claims are no longer live.

to determine whether Suominen suffered detriment from relying on Goodman's promise.

The jury found that Suominen was unlawfully denied a share of the promote on eight projects, for total promissory estoppel damages of $1,216,623 (with prejudgment interest, $1,711,005.87). The trial judge eventually concluded that the defendants each should face joint and several liability for those damages, and he entered a judgment to that effect on September 25, 2008. How the judge came to this conclusion, and other facts relevant to the parties' particular claims, are developed further below as the issues arise.

*Discussion.* 1. *Jurisdiction over the defendants' appeal.* Before reaching the merits of the defendants' arguments, we must decide whether those arguments are properly before us. The defendants filed a notice of appeal on October 9, 2008, and Suominen filed a cross appeal two weeks later. Once the parties received notice of the assembly of the record, Suominen, but not the defendants, timely paid a docketing fee. See Mass.R.A.P. 10(a)(1), as amended, 435 Mass. 1601 (2001) (generally requiring payment of docketing fee within ten days of receipt of notice of assembly of record). Some five days after the payment period had run, Suominen filed a motion to dismiss the defendants' appeal in Superior Court pursuant to Mass.R.A.P. 10(c), as amended, 417 Mass. 1602 (1994). In the defendants' opposition to the motion and at a hearing on the motion, the lawyer who was serving as the lead on the case at the time sought to explain his neglect. Specifically, he documented how his failure to pay the docketing fee was caused by a significant personal crisis that temporarily had rendered him unable to function and, in his words, "a catatonic zombie."[7] Based on this showing, the motion judge (who was not the trial judge) found "excusable neglect," and she denied the motion to dismiss. Suominen challenges that ruling in his cross-appeal.

We see no good reason to repeat the details of the personal

[7]As documented by affidavit, this counsel was at the relevant time "the sole attorney covering the matter." Although a second lawyer (who had jointly tried the case) still had an appearance on file, that lawyer (and other lawyers at the firm) had no knowledge of his colleague's personal crisis and had no reason to doubt that the litigation deadlines would be met.

crisis that counsel faced. Instead, we find it sufficient to state that the appellate rules are not so unforgiving as to render the motion judge's conclusion that the neglect here was "excusable" an abuse of her discretion.[8] We proceed then to a discussion of the defendants' claims.

2. *The merits of the defendants' appeal.* a. *Detriment.* The defendants focus on Suominen's promissory estoppel claim, the foundation of almost all of the damages assessed against them.[9] Reduced to basic terms, promissory estoppel "consists simply of a promise that becomes enforceable because of the promisee's reasonable and detrimental reliance." *Rooney* v. *Paul D. Osborne Desk Co.*, 38 Mass. App. Ct. 82, 83 (1995). The defendants focus principally on whether any reliance was "detrimental," something that the Supreme Judicial Court recently reaffirmed was a separate element of a promissory estoppel claim. *Anzalone* v. *Administrative Office of the Trial Ct.*, 457 Mass. 647, 661 (2010), citing *Sullivan* v. *Chief Justice for Admn. & Mgmt. of the Trial Ct.*, 448 Mass. 15, 27-28 (2006). The defendants claim two different sorts of errors related to detriment. First, they argue that the judge erred by not separately charging the jury on detriment and by not having them determine whether this element was present. Second, they argue that the evidence of detriment was insufficient as matter of law, and that the judge therefore erred in not granting their motion for directed verdict. We address these claims in that order.

(i) *Jury instructions.* The jury were specifically asked whether, and did find that, Suominen continued his employment at GIE in reliance on Goodman's promises. The judge had initially intended to charge the jury with answering an additional special question: whether Suominen had "suffered some detriment, that

[8]*Maciuca* v. *Papit*, 31 Mass. App. Ct. 540, 545-546 (1991), is not to the contrary. There, this court found no excusable neglect after concluding that the lawyer's excuse, his partial disability, had nothing to do with his failure to comply with the rules.

[9]The Supreme Judicial Court long ago observed that "the expression 'promissory estoppel' . . . tends to confusion rather than clarity." *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978). In light of this, the trial judge himself referred to Suominen's claim as one for "detrimental reliance." Although we see substantial merit in this suggestion, we will employ the more common term "promissory estoppel," which the Supreme Judicial Court continues to use.

is, some financial injury as a result of relying on this promise or misrepresentation." However, at the charge conference, the judge decided to eliminate that separate question, citing the potential for jury confusion that including the question might cause. In the judge's view, the question was unnecessary, because if the jury determined that Suominen continued his employment in reliance on the promise, this by itself established sufficient detriment as matter of law. After the charge was given, the defendants renewed their objection to the absence of an instruction or special question on detriment.

We disagree with the trial judge's conclusion that Suominen's continuing his employment was sufficient by itself to establish his detriment as matter of law. In our view, the judge erred by conflating continued employment — the action Suominen took in reliance on the promises — and detriment. That this was error is best illustrated by reference to the facts. Although Suominen began his employment at GIE in 1999 at a salary somewhat below the one at his most recent earlier employment, he earned compensation above that level in 2001 as a result of the Milford distributions. Then, in late 2002, Suominen requested and received a 125% raise, putting his base salary at a level at almost twice what he was making before joining GIE. He also never alleged that he forwent any other job opportunities or business ventures by staying with GIE, and even after he was fired, he desired to stay on as a consultant at his existing salary. Under these particular circumstances, the jury could have found, had they been asked, that Suominen did not suffer any detriment from continuing to work at GIE without receiving the additional payments he had been promised.[10] As a result, the defendants were found liable without any resolution by the jury of whether Suominen had proven an essential element of his cause of action.[11] The judgment therefore cannot stand, and the defendants are entitled

[10]There is no merit to Suominen's suggestion that the failure to receive the promised payments itself can supply the requisite detriment. This would be equivalent to reading the element of detriment out of the cause of action completely.

[11]Our cases do recognize that, with regard to an employee's claim based on ordinary contract, merely continuing one's employment can be sufficient consideration to accept what was effectively a standing offer about the terms of that employment, even where the employer did not intend to make such an offer. See O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 693 (1996)

at least to a new trial. *Frostar Corp.* v. *Malloy*, 63 Mass. App. Ct. 96, 108 (2005).

(ii) *Sufficiency of the evidence.* We turn now to the defendants' argument that Suominen's proof of detriment was insufficient as a matter of law. The defendants argue essentially that an employee cannot prove detriment based solely on continued employment unless he provides evidence of specific job opportunities that he forwent, economic harm, or that he accepted additional duties or responsibilities in reliance. For this proposition, they rely in large part on this court's 1987 decision in *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84 (1987) (*Hall*), a case they contend is dispositive.

In *Hall*, the plaintiff was promised an option to buy company stock. *Id.* at 86. We held that any reliance on the promise was unreasonable as matter of law in light of the "inchoate" nature of the negotiations over the stock option plan. *Id.* at 94. In lieu of resting solely on this ground, however, we also addressed the employee's assertion that he had detrimentally relied on the promise by staying in his position longer than he otherwise would have. *Id.* at 93. We concluded that there was insufficient proof of detriment: "During the period of negotiations, [the plaintiff] received significant pay increases . . . . There is no evidence of how [the plaintiff] fared as an independent entrepreneur [the path that the plaintiff pursued upon leaving the company] and, therefore, whether he suffered any economic loss by postponing his own venture." *Id.* at 94.

The facts present here are distinguishable from those in *Hall* in various respects.[12] First, the promise at issue in *Hall* was made nine years after the employee began working at the

---

(personnel manuals can create enforceable rights). Given the similarity between such "unilateral contracts" and claims of promissory estoppel, it is not entirely clear why one, but not the other, would require more than continued employment to render a promise enforceable. However, absent clarification from the Supreme Judicial Court that continued employment alone is sufficient to establish detrimental reliance in a promissory estoppel claim, we feel compelled to conclude it is not.

[12]To the extent that the animating principle behind the alternative holding in *Hall* was an assumption that one must prove quantifiable economic loss in order to make out a claim of promissory estoppel, subsequent case law raises some reason to question that assumption. Thus, for example, recent case law makes plain that forbearance of a colorable legal claim alone can make out

company. *Id.* at 92. Here, by contrast, Suominen began his employment based on an expectation that he would receive additional incentive compensation, and there was evidence that, at least until he received his raise in November of 2002, Suominen was working at a salary below his market rate.[13] Moreover, Suominen testified that — because he had been promised a share of the promote — he worked considerably harder in his salaried position than he otherwise would have, something that the jury were entitled to credit. The possibility of this type of detriment was not discussed in *Hall.*

Without attempting to resolve the precise contours of what a plaintiff must show to prove detrimental reliance based on continued employment, we conclude that Suominen did present sufficient evidence of detriment here to send the case to the jury. In other words, just as the jury reasonably could have found no detriment based on the evidence presented, so too they reasonably could have found the opposite. We therefore conclude that the defendants are not entitled to judgment in their favor as matter of law, and that the judge did not err in denying the defendants' motion for judgment notwithstanding the verdict.[14]

b. *Personal liability.* Goodman also argues that there was insufficient evidence for him to be held personally liable as

"legal detriment" without having to demonstrate the ultimate viability of such a claim. See *Sullivan* v. *Chief Justice for Admin. & Mgmt. of the Trial Ct.,* 448 Mass. at 27-28; *Cannon* v. *Cannon,* 69 Mass. App. Ct. 414, 422-423 (2007).

[13]We recognize that when Suominen began as a salaried employee, his discussions with Goodman over his incentive-based compensation had not progressed to the point that they could have supported a claim of promissory estoppel. They fairly quickly developed to that point, however, and Suominen continued to work for his depressed salary.

[14]Although the defendants principally focus on the absence of detriment, they also argue that Suominen's reliance on Goodman's promises was unreasonable as matter of law. For example, they suggest that Suominen ignored several obvious "red flags" that should have alerted him that he was not in fact going to receive a share of the promotes. We need not pause long on such arguments. Although cases do recognize that there are situations where any reliance would so obviously be unreasonable that the claim can be resolved as matter of law, see, e.g., *Rhode Island Hosp. Trust Natl. Bank* v. *Varadian,* 419 Mass. 841, 850 (1995), whether reliance was reasonable is more typically treated as a question of fact to be resolved by the jury. See *Cannon* v. *Cannon,* 69 Mass. App. Ct. at 423; *Nova Assignments, Inc.* v. *Kunian,* 77 Mass. App. Ct. 34, 39 (2010). Suominen presented sufficient evidence of reasonable expectations and behavior to send the matter to the jury.

matter of law. He highlights that Suominen was a salaried employee of GIE, that the promised compensation was for work Suominen performed in that capacity, and that Suominen never even asserted, much less proved, that GIE's corporate form could be disregarded through "piercing the veil." Suominen does not rely on "veil piercing" as such. Instead, he argues that Goodman is directly, not derivatively, liable, because he made his promises of additional compensation while acting in a personal capacity. In order to determine our proper role in reviewing such issues, we must examine in some detail how these issues developed before the judge and jury.

Regarding Suominen's contract claim, the trial judge instructed the jury that "the question of who entered into the contract, whether it was Mr. Goodman personally or whether it was he on behalf of GIE, or both, is a question that you will need to consider." Consistent with this instruction, the special verdict form asked the jury whether Goodman on his own behalf had entered into a contract with Suominen, and separately asked them whether he had done so on behalf of GIE. However, neither the jury instructions on promissory estoppel nor the special questions on that theory drew any such distinctions. Instead, the jury were asked simply whether "Goodman" made a promise or representation to Suominen, without asking the jury to consider (or resolve) on whose behalf Goodman had made such a promise. As a result, even after the jury ruled, there was an open question whether the liability would run to GIE, to Goodman personally, or to both.

After the jury's verdict, the defendants, who were jointly represented, initially took the position that the jury had in fact found promissory estoppel liability only against GIE. Suominen argued that the jury had in fact found Goodman personally liable.[15] The issue of which defendant should be held liable came to a head at a postverdict hearing. Characterizing the question as "difficult and close," the trial judge concluded that both defendants should be held liable on the promissory estoppel claim, and he eventually entered a judgment imposing joint and several liability for the damages related to that claim.

---

[15]At this stage, both sides focused on whether Goodman was personally liable and showed less interest in GIE's liability. As Suominen acknowledged to the judge, his ability to reach and apply Goodman's shares of equity in the deal companies depended on Goodman's being found personally liable.

Although each side continues to make some suggestion that the jury in fact ruled in that side's favor on the issue, the reality is that the jury never resolved what "hat" Goodman was wearing when he made his promises. How to proceed in the face of such an omission is addressed by rule. Specifically, Mass.R.Civ.P. 49(a), 365 Mass. 812 (1974), states in pertinent part:

> "If in [charging the jury on special verdict questions], the court omits any issue of fact raised by the pleadings or the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on special verdict."

The question of Goodman's personal liability thus fell to the trial judge to resolve, and the judge did so. Although the judge did not make an express finding that Goodman made his promises in a personal capacity, by operation of rule 49, the judge "shall be deemed to have made a finding in accord with the judgment [he entered] on special verdict." Therefore, properly conceptualized, the question we face is whether the judge's implicit finding that Goodman made his promises in a personal capacity was clearly erroneous.[16]

We discern no clear error in the judge's implicit finding that Goodman was acting in a personal capacity when he made his promises (although we also agree with the judge that the issue is "difficult and close"). While Suominen was nominally a salaried employee of GIE, given how Goodman structured his businesses, Suominen effectively worked for the whole enterprise. Moreover, the specific promise at issue was that Suominen share a portion of Goodman's own promote, not a share of any obligation owed to GIE.[17] Under these circumstances, there was evidence to support the judge's implicit finding.

---

[16]None of the parties cited to rule 49 in their briefs. We raised the potential applicability of the rule at oral argument, and the parties addressed the issue at that time.

[17]This is not to say that the promised payments were to come to Suominen directly from Goodman. But whether the money due to Suominen would have

c. *Suominen's Wage Act claim.* Suominen initially sought a share of the promote on seventeen projects, but he reduced that number to nine by the time of trial. For five of those projects, Suominen claimed his share was "due and payable" to him by the day he was fired, and that the defendants' failure to make those payments on that day constituted a violation of the Massachusetts Wage Act, G. L. c. 149, § 148. For these violations Suominen sought treble damages and attorney's fees pursuant to G. L. c. 149, § 150.[18] The judge declined to let this claim go to the jury, dismissing it through his partial allowance of the defendants' motion for a directed verdict. In his cross appeal, Suominen argues that this was error.

The Wage Act requires that an employer expeditiously pay a terminated employee his full wages and similar compensation (with the precise deadline determined by the act's complicated provisions). The statute applies to wages, to holiday and vacation pay, and, "so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." G. L. c. 149, § 148, as appearing in St. 1956, c. 259. Suominen argues that the amounts he was owed as a share of the promote was a "commission" covered by the Wage Act, and that all he need show was that the amount of the money he was due as that commission was "arithmetically determinable" by the date he was fired. See *Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 780 (2007) (Wage Act applies to commissions that are "arithmetically determinable" by the relevant deadline). The parties contest the ease with which such calculations could have been made.[19] We need not

been funneled through GIE (or been paid in a different manner) appears to have depended entirely on Goodman's discretion. This supports the conclusion that the promises were not being made on behalf of GIE as a stand-alone enterprise.

[18]At the time of the relevant violations, treble damages were discretionary, not mandatory. See G. L. c. 149, § 150, second par., as then in effect. Given how we rule, we need not address Suominen's argument that a subsequent statutory amendment (St. 2008, c. 80, § 5) should be applied retroactively.

[19]Suominen argues that while calculating the amount of the overall promote might be difficult, Suominen was owed 23.33% of whatever promote was paid, and the jury had before them the evidence of what promote payments Goodman had made to himself before Suominen was fired.

resolve this debate, because we conclude that the promote payments were not "commissions" within the meaning of the Wage Act, regardless of whether they were "due and payable" at the time that Suominen was fired.

The term "commission" is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price. See, e.g., Webster's New Universal Unabridged Dictionary 364 (2d ed. 1983) (defining "commission" as "[a] percentage of the money taken in on sales, given as pay to a salesclerk or agent, usually in addition to salary or wages"). The compensation at issue here was of a different sort, a share of the overall profits generated by the development efforts. Whatever the precise boundary of the term "commission" as used in the Wage Act, we agree with the trial judge's conclusion that any money owed Suominen under such a profit-sharing arrangement was not a "commission" covered by the statute.[20] The judge therefore correctly dismissed Suominen's Wage Act claim.[21]

*Conclusion.* For the reasons set forth above, the judgment is vacated to the extent that it orders GIE and Goodman jointly and severally to pay $1,711,005.87 to Suominen. Retrial is necessary, however, only on the issue of whether Suominen's continuing his employment at GIE in reliance on Goodman's promises was to his detriment. See *One to One Interactive, LLC* v. *Landrith,* 76 Mass. App. Ct. 142, 153 (2010) (affirming in part and remanding for new trial on single issue). The judgment is affirmed in all other respects, and this matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

[20]In *Commonwealth* v. *Savage,* 31 Mass. App. Ct. 714, 716 (1991), we concluded that real estate commissions earned by a broker who was essentially an independent contractor are not covered by the Wage Act. In *Okerman* v. *VA Software Corp., supra* at 778-779, we raised some doubt about the continued viability of *Commonwealth* v. *Savage* in light of *Weidmann* v. *Bradford Group, Inc.,* 444 Mass. 698, 703-704 (2005). We need not reach this issue since we do not rely on *Commonwealth* v. *Savage.*

[21]There is some doubt about whether one can even make out a Wage Act claim where there is no bilateral contract requiring the compensation at issue. We need not reach this issue.