NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-794

TOWN OF HOLDEN

vs.

DEPARTMENT OF CONSERVATION AND RECREATION & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In May 2013, the town of Holden (Holden) commenced this action against the defendants, the Department of Conservation and Recreation (DCR) and the city of Worcester (Worcester), claiming the defendants had overcharged it for the transportation of Holden's sewage through Worcester to its final destination at a wastewater treatment facility in Millbury (treatment facility).  Following an eight-day trial in the summer of 2022, the jury found against Holden on its breach of contract claim against DCR, but in favor of Holden on its unjust enrichment claim against Worcester.  The trial judge adopted the

---

[1] City of Worcester.

jury's findings of fact and their special verdict on the unjust enrichment claim.[2]  See Delaney v. Chief of Police of Wareham, 27 Mass. App. Ct. 398, 401 (1989).  The judge subsequently denied Worcester's motion for judgment notwithstanding the verdict (judgment n.o.v.) on the unjust enrichment claim and Holden's cross motion to set aside the verdict on the contract claim.  These cross appeals from the final judgment followed.  We affirm.

Background.  We recite the facts the jury could have found, as supplemented by the judge's findings of fact, reserving certain details for later discussion.  See Tocci v. Tocci, 490 Mass. 1, 3 (2022).  In the late 1980s, the Wachusett Reservoir and its watershed -- the public water supply for over 2.5 million people -- was at risk from failing septic systems.  In

_____

[2] Answering special questions, the jury found that DCR committed a breach of its agreement with Holden to charge Holden only its "proportionate applicable [wastewater] transport costs" each time DCR billed Holden, but that the breaches were excused by waiver.  The jury further found that Worcester knowingly received a valuable benefit from Holden and that it would be inequitable to allow Worcester to keep the benefit.  Further finding that Holden had not unreasonably delayed bringing its unjust enrichment claim against Worcester, the jury found that the value of the benefit unlawfully retained by Worcester was $14,604,237.  The judge subsequently determined that the jury found, consistent with his instructions, an absence of prejudice to Worcester.  Having reserved the declaratory judgment count to himself, the judge made additional findings and ultimately concluded that Holden was not entitled to the declaratory judgment it sought.  No aspect of the declaratory judgment count is before us in this appeal.

1993, the Massachusetts Water Resources Authority (MWRA), DCR,[3] and the Massachusetts Department of Environmental Protection (DEP) entered into a consent order requiring the MWRA and DCR to implement a watershed protection plan for the area. The DEP imposed a series of deadlines on DCR and the MWRA for the planning and construction of treatment facilities that would bring the watershed area into compliance with State and Federal environmental laws. The facilities plan developed by MWRA and DCR called for the expansion of sewer systems in three towns located in the watershed area (Holden, West Boylston, and Rutland), the transportation of the towns' sewage to the treatment facility through neighboring Worcester, and improvements to Worcester's sewer system to accommodate the increased flow of wastewater through it. The State made significant contributions to the project.

Around 1996 negotiations over a master sewer use agreement between the three towns, Worcester, and the DCR began but broke down; at that point, DCR, aided by the Massachusetts Executive Office of Environmental Affairs, began negotiating solely with Worcester for a sewer use agreement. During the negotiations,

---

[3] Many of the relevant documents in this litigation were entered into by the Metropolitan District Commission and other predecessor agencies of DCR. Where nothing turns on this and for ease of reference, we shall refer in this decision to both DCR and its predecessor agencies as DCR.

Worcester expressly rejected Holden's transport rate proposal that included Worcester's actual total flow in the calculus, deeming it "grossly inadequate" to what Worcester was seeking in total revenue for the use of its sewer system.

In December 1999, upon DCR's completion of the sewer expansion project in Holden, DCR and Holden entered into a contract transferring to Holden the care, custody, and control of the new sewer components (1999 Holden-DCR contract). Pursuant to the fourth paragraph of that contract, Holden agreed "to pay directly to [DCR] all proportionate applicable transport costs (as finally determined and agreed to by the Town of Holden) for the transport of sewage . . . to the [treatment facility], including the costs of sewage transport through the City of Worcester." But for this "critical" provision requiring Holden's approval of the transport rate, Holden would not have signed the agreement. Worcester was not a party to the 1999 Holden-DCR agreement.

By the spring of 2000, "time was running out" to bring the watershed area into compliance with Federal and State law, and DCR "was anxious to turn the valve on" allowing sewage to flow into Worcester. In May 2000, Worcester and DCR entered into a "Sewer Use Agreement . . . For Intermunicipal Sewer Use" (May 2000 SUA). The agreement referenced the 1993 consent order, the public interest in expanding the public sewer system, and the

4

financial assistance from the State.  Pursuant to that contract, Worcester agreed to "receive, transport and convey [Holden's] wastewater . . . from points of connections . . . to the Treatment Plant."  The agreement established a rate calculation methodology (May 2000 SUA formula) for determining the amount owed to Worcester for transporting the towns' sewage through it.  The May 2000 SUA formula allowed Worcester to (1) pass along significant and unproportionate costs to Holden, including stormwater management and capital costs that had nothing to do with Holden's use of the Worcester sewer system, and (2) undercount its actual billable flow (increasing Holden's share of the costs).[4]  For example, the judge found, and Worcester does not dispute, that Worcester's costs for its sewer system, consisting of forty-five percent stormwater pipes and fifty-five percent sanitary sewer pipes, are managed together; and that although Holden does not use any of Worcester's stormwater system, Worcester includes the costs for it in the fees charged to Holden.  DCR had voiced objections to the fairness of the

_____

[4] The rate methodology was at odds with (1) the stated intention of DCR referenced in the agreement to adopt "a revised method of computing a sewer use rate reflecting [Holden's] proportional use of the [Worcester] sewer system to be paid by [Holden]" and (2) the agreement's definition of "[u]ser charges" ("charges levied in proportion to the use of sewage works"). Not only was Holden's approval of the formula not secured, the May 2000 SUA expressly disclaimed the "creat[ion of] a contractual relationship" with any third parties.

formula but ultimately signed the agreement.[5]  Both before and after the execution of the May 2000 SUA, Holden objected to DCR and to Worcester about the unfair methodology.[6]  Holden declined to sign the May 2000 SUA or to execute a similar sewer use agreement with DCR or Worcester incorporating the May 2000 SUA formula.

In the spring of 2000, Holden made the necessary connections, went online, and began sending its sewage through Worcester to the treatment facility.[7]  Commencing at that time,

---

[5] The chief negotiator for DCR noted that the formula "produces a higher rate of return to the city than the actual cost to the city for the operation and maintenance of its sewer system . . . [and] represents a significant cost sharing with the city by the towns without any apparent proportional benefit to the towns."  Worcester recognized that implementation of the May 2000 SUA would increase the city's revenue at a "minimal increase in cost" to Worcester's ratepayers; and that the May 2000 SUA formula, including "[a]voidance of [the] total flow methodology," would produce a "distinct economic advantage to Worcester."  Worcester rejected DCR's alternative proposed methodologies that DCR explained would produce "fair and equitable compensation."

[6] The judge found that Worcester was aware that Holden objected to the amount of the fees and paid them under protest.

[7] DCR considered and rejected a number of possible solutions that did not require Holden to transport its sewage through Worcester, including a water filtration plant that would have cost the State approximately one billion dollars to construct. As the trial judge found, the expansion of sewage treatment and the transport of Holden's wastewater was determined to be the most cost effective alternative for the protection of the watershed area.

DCR billed Holden quarterly for the wastewater transport.[8]  Since 2000, Holden has made all quarterly payments.[9]  In 2013, Holden filed a complaint in the Superior Court and began including letters of protest with each quarterly payment.[10]

Discussion.  1.  Standard of review.  "We must uphold the jury verdict as long as anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff" (quotation and citation omitted).[11]  Rabassa v.

---

[8] The judge found that beginning in the early 2000s, the parties adopted a general practice whereby Worcester, using the May 2000 SUA formula, calculated the amount owed by Holden for each quarter and sent the bills to DCR.  In turn, DCR forwarded Worcester's bills to Holden with instructions to send checks made payable to Worcester back to DCR.  Upon receipt, DCR delivered the checks to Worcester, which accepted and negotiated Holden's checks.

[9] Under the May 2000 SUA, DCR had the ability to institute a "Cherry Street" interceptor process, which would allow it to take what Holden owed in transport fees out of Holden's local aid from the Legislature to satisfy Worcester's charges.  Holden received one such letter from DCR threatening to start the process if Holden failed to pay its bill.

[10] Holden paid Worcester a total of $21,436,842.30 for sewage transport between May 2007 and May 2022.  Holden's expert witnesses testified that of that amount, Holden paid $17,382,826 in overcharges to Worcester and explained that a Holden ratepayer paid ten times as much for sewage transport through the Worcester system as did a Worcester ratepayer.  Worcester does not challenge the amount of damages, just its liability for them.

[11] Worcester stated in its principal brief that "the trial judge" decided the unjust enrichment claim.  In its reply brief, Worcester claimed for the first time that the judge did not

7

Cerasuolo, 97 Mass. App. Ct. 809, 814 (2020).  See Dobos v. Driscoll, 404 Mass. 634, 656, cert. denied, 493 U.S. 850 (1989) (articulating standard for reviewing judge's denial of motion for judgment n.o.v.).  We review legal conclusions de novo.  See Governo Law Firm LLC v. Bergeron, 487 Mass. 188, 199 (2021).

2.  Unjust enrichment.  a.  Sufficiency of evidence. "Restitution is an equitable remedy by which a person who has been unjustly enriched at the expense of another is required to repay the injured party" (citation omitted).  Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 643 (2013).  To prevail on a claim for unjust enrichment, a plaintiff must establish "not only that the defendant received a benefit, but also that such a benefit was unjust."  Id. at 644.  See Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (basis of right of recovery under doctrine of unjust enrichment is "that in a given situation it

_____

decide the claim as promised, but rather violated Mass. R. Civ. P. 39 (c), 365 Mass. 801 (1974), by, sua sponte, treating the jury's special verdict as binding against Worcester's wishes.  These positions seem inconsistent, and the claim of error, raised for the first time in a reply brief, comes too late.  See Katz, Nannis & Solomon, P.C. v. Levine, 473 Mass. 784, 795 n.15 (2016).  In any event, any procedural error was harmless where the judge fully adopted the jury's special findings on unjust enrichment as his own, and as Worcester acknowledges, the standard of review in this situation is the same, both on findings of fact and rulings of law.  See Merola v. Exergen Corp., 423 Mass. 461, 463 (1996).  See also H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13 (2022); Governo Law Firm LLC v. Bergeron, 487 Mass. 188, 199 (2021).

8

is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed to examine the circumstances and the conduct of the parties and apply this standard" [citation omitted]). "The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations" (citation omitted). Metropolitan Life Ins. Co., supra.

Worcester contends that the evidence was insufficient to show that Holden conferred a measurable benefit on Worcester and that the benefit received cannot be deemed unjust. We conclude that the jury's findings of fact and verdict in favor of Holden on the unjust enrichment claim were amply supported by the evidence.

First, to the extent that Worcester seeks cover in the terms of the 1999 Holden-DCR agreement -- pursuant to which Holden's payments were to be made to DCR -- there was evidence presented from which the jury could have found that Worcester was the real beneficiary of Holden's payments and that DCR was a mere conduit of the checks made payable to Worcester. It was undisputed that Worcester placed the transport fees paid by

Holden in an enterprise fund to help sustain the operation of Worcester's sewer department.[12]  The jury, moreover, heard evidence about Holden's expectation before the May 2000 SUA was signed that it would pay a fee based on its proportionate share of the costs of the sewage transport through Worcester.  Knowing full well Holden's expectations, Worcester and DCR forged ahead with the May 2000 SUA that, as the judge determined, charged Holden fees unrelated to Holden's actual use of Worcester's sewer system and manipulated the volume of flows to justify disproportionate fees to Holden.  As the judge concluded, the fact that Worcester and DCR agreed on the formula did not preclude a finding by the jury that Worcester knew the fees charged to Holden were unfair in the first instance.  In short, the jury could have found that Holden's reasonable expectations about paying a fair and proportionate fee for the sewage transport were defeated, and further that Worcester was no mere innocent party billing for amounts it believed were due under its May 2000 SUA, but rather, as the judge put it, an active participant "in imposing excessive and disproportionate charges on Holden."[13]

_____

[12] Worcester's sewer department operates as an independent business unit within the city known as an enterprise fund, and maintains a separate budget.

[13] Even assuming that Worcester's underlying actions here consisted simply of calculating sewage transport fees due

b.  Worcester's defenses.  Worcester maintains that a number of defenses required judgment to be entered in its favor on Holden's unjust enrichment claim.  We consider each in turn.

i.  Freedom of contract principles.  "'[T]he general rule of our law is freedom of contract . . . [and] it is in the public interest to accord individuals broad powers to order their affairs through legally enforceable agreements' . . . even where, as here, the enforcement of the contract appears to produce harsh results" (citation omitted).  Cummings Props., LLC v. Hines, 492 Mass. 867, 869 (2023).  It is equally true that "contract rights are [not] absolute; for government cannot exist if the citizen may at will . . . exercise his freedom of contract to work . . . harm [to his fellow citizens].  Equally fundamental with the private right is [the right] of the public to regulate it in the common interest" (citation omitted).  Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 320 (1996).  In other words, sometimes public policy considerations outweigh the public interest in freedom of contract.  See id. at 320-321.  See A.Z. v. B.Z., 431 Mass. 150, 160 n.24 (2000) (Supreme Judicial Court noted it has "refused to

_____

pursuant to the May 2000 SUA with DCR, liability under Massachusetts law "may extend to recipients who were not responsible for wrongful conduct."  Sacks v. Dissinger, 488 Mass. 780, 790 (2021).

11

enforce contracts in a variety of contexts" due to public policy concerns).

We conclude that freedom of contract principles did not compel the judge to enforce the May 2000 SUA as written and to enter judgment in Worcester's favor on the unjust enrichment claim. The May 2000 SUA impacted not just the two parties to it, but also the ratepayers of the three towns in the watershed area. Worcester may not have had any obligation to accept wastewater from another town, but once it took on that obligation, the jury could have found that it had an obligation to be fair to the other towns; to the extent that Worcester argued that the May 2000 SUA formula was fair, the jury could have found otherwise. Freedom of contract does not extend to charging unjust fees that would ultimately be paid by a municipality that had no rights under that agreement, over its objection and in defeat of its reasonable expectations.[14] This

_____

[14] At the oral argument, Worcester's attorney maintained that Worcester could have charged whatever it wanted for the transport, including "unreasonable" fees. As examples, he suggested $1 million per day for the use of its sewer system or requiring the installation of free, high-speed rail service from Boston to Worcester would have been permissible user fees. The rule of proportionality engrained in our law and constitution do not support Worcester's assertions. See G. L. c. 83, § 16 (requiring "just and equitable" charges for use of municipal sewer systems); Carson v. Sewerage Comm'rs of Brockton, 175 Mass. 242, 244 (1900) (Holmes, C.J.) (common sewer assessment to individual "must be proportional to the benefit, and not in excess of it"), aff'd, 182 U.S. 398, 403-404 (1901) ("legislative power [may] assess the amount of benefit specially

12

is especially true, we think, where the public water supply was involved and Holden had no other viable option for transporting its sewage to the treatment facility.[15]  See Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 431-432 (1995) (after balancing needs and expectations of policy purchasers, their lack of bargaining power, and possible harm to public against freedom of contract principles, court declined to enforce integration clause exculpating insurer from loss arising from its own negligence).

 ii.  Contract bar rule.  It is black letter law that a party may not seek recovery on a theory of unjust enrichment "where a valid contract defines the obligations of the parties." Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 60 (2017).  See Metropolitan Life Ins. Co., 464 Mass. at 641;

---

received . . . so long as such amount is not grossly excessive, or out of all proportion to the benefit received").  See also Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth (granting authority to Legislature "to impose and levy proportional and reasonable assessments, rates, and taxes").

 [15] Worcester's apple orchard example is inapposite.  It is true that the owner of the only apple orchard in a geographical area may command a very good price for its apples from its customers without fear of liability for unjust enrichment.  The factual situation in this case is much different.  The players are public entities in a highly regulated area.  While Worcester accommodated DCR's need to transport the sewage from three towns, it did not do so out of the goodness of its heart.  The State paid significant amounts of money to Worcester for improvements to its sewer system.

Zelby Holdings, Inc. v. Videogenix, Inc., 92 Mass. App. Ct. 86, 92 (2017). See also Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment").

The rule has no application here where Holden's counterpart in the express contract (the 1999 Holden-DCR contract), DCR, subsequently entered into a second contract with a third party (Worcester) that violated its agreement with Holden, and, with Worcester's knowledge and active participation, worked a serious injustice on Holden. No principle of Massachusetts law bars Holden's claim against Worcester in this context. We find no error in the conclusion reached by three different judges over the course of this litigation that the existence of the 1999 Holden-DCR contract did not preclude Holden's unjust enrichment claim against Worcester.

iii. _Adequate remedy of law_. The same three judges rejected Worcester's related argument that the availability of a remedy of law under the 1999 Holden-DCR contract barred Holden's unjust enrichment claim. We discern no error. One universally-accepted tenet of contract law prohibits a party from negotiating and entering into an express written contract governing a particular subject matter and thereafter seeking to override one of its provisions through a claim of unjust

14

enrichment. See County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc., 358 Md. 83, 97-98 & n.8 (2000) (exhaustively collecting State and Federal cases). Here, Holden never had an express agreement with Worcester about sewage transport that it sought to supplant through the equitable remedy of unjust enrichment. Contrast Malden Police Patrolman's Ass'n, 92 Mass. App. Ct. at 60 (collective bargaining agreement governing paid details performed by police officers precluded union's unjust enrichment claim against city). Nor did the 1999 Holden-DCR contract purport to define Worcester's obligations to Holden. The fact that Holden had an "adequate remedy of law" against DCR pursuant to that contract thus did not bar an unjust enrichment claim against Worcester. See Boston Med. Ctr. Corp. v. Secretary of the Executive Office of Health & Human Servs., 463 Mass. 447, 467 (2012) ("A plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties"); Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014) ("Under Massachusetts law, the existence of a contractual relationship between the parties typically precludes an unjust enrichment claim arising out of that contract" [emphasis added]). In addition, as the trial judge explained, Worcester's sweeping statement that "there can be no unjust enrichment in contract cases is plainly erroneous": courts have allowed

15

recovery on equitable grounds notwithstanding the existence of a fully integrated written contract between the parties.  See, e.g., Sugarman & Sugarman, P.C. v. Shapiro, 102 Mass. App. Ct. 816, 819-820 & n.7 (2023).  Worcester's argument based on the "longstanding maxim" that Holden cannot recover in equity due to the availability of a legal remedy fails for the reason that it is based on a faulty factual premise.  Holden's breach of contract and unjust enrichment claims did not seek recovery "based on the same circumstances and based on the exact same injury."  To the contrary, Holden's claims were based on distinct injuries inflicted by two different parties at different times.

iv.  Laches.  Finally, we conclude Worcester's reliance on the affirmative defense of laches to set aside the unjust enrichment verdict is unavailing.  As Worcester acknowledges, the finding as to laches must stand unless clearly erroneous.  See A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund, 445 Mass. 502, 517 (2005).  A successful defense of laches requires a showing not only of unreasonable delay, "but delay that works disadvantage to another" (citation omitted).  Id. See West Broadway Task Force v. Boston Hous. Auth., 414 Mass. 394, 400 (1993) (unreasonable delay in bringing claim that "results in some injury or prejudice to the defendant" operates to bar claim).  Contrary to Worcester's assertion, there was

16

evidence that Holden put Worcester on notice that it was objecting to the May 2000 SUA formula dating back to the negotiation period of that document.  Even assuming that the finding that Holden's delay in bringing suit was reasonable was clearly erroneous, Worcester failed to demonstrate prejudice.  Worcester's theory of material disadvantage is that using Holden's overpayments, it lowered its sewer rates for over a decade, benefiting this group of ratepayers, but that many of the current ratepayers were not users during that time period and would be unfairly forced to pay for the judgment.  This is all theoretical, however.  First, Worcester presented no evidence comparing the subsets of users -- or any evidence that it had at least attempted to compile the statistics.  Second, Worcester presented no evidence that it actually lowered its rates.  For all we know, the money paid by Holden was placed in the enterprise reserve fund and never used (as opposed to decreasing amounts paid by Worcester ratepayers).  Worcester has not met its burden of showing that the finding of a lack of prejudice was clearly erroneous.  See Santagate, 64 Mass. App. Ct. at 333.

    3.  Prejudgment interest.  There was no error in the judge's grant of prejudgment interest under G. L. c. 231, § 6C (§ 6C).  See Anastos v. Sable, 443 Mass. 146, 154-155 (2004).

17

First, Holden's unjust enrichment claim is quasi contractual in nature. Salamon v. Terra, 394 Mass. 857, 859 (1985) ("A quasi contract . . . is an obligation created by law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent . . . . It is not really a contract, but a legal obligation closely akin to a duty to make restitution" [quotations and citations omitted]). Second, as the judge noted, this court has ruled that § 6C applies to equity-based claims, including not only quantum meruit, see Zabin v. Picciotto, 73 Mass. App. Ct. 141, 151, 155-156 (2008), but also unjust enrichment, see Brennan v. Ferreira, 102 Mass. App. Ct. 315, 319 (2023) (shareholder was entitled to prejudgment interest on her derivative claim). See also Suominen v. Goodman Indus. Equities Mgt. Group, LLC, 78 Mass. App. Ct. 723, 728 n.5 (2011) (allowing prejudgment interest on unjust enrichment damages award to stand); SiOnyx LLC v. Hamamatsu Photonics K.K., 981 F.3d 1339, 1347 (1st Cir. 2020) (holding that § 6C applies to damages for unjust enrichment).

Finally, we disagree with Worcester's characterization of the jury's monetary award as "purely restitutionary" and based on "disgorgement of profits." See Governo Law Firm LLC, 487 Mass. at 199-200 (monetary awards based on disgorgement of profits are measured by defendant's gain rather than plaintiff's loss, are not designed to make plaintiff whole, and do not

18

constitute "damages").  The jury here awarded compensatory damages measured by Holden's overpayments on a quarterly basis to Worcester.  During those time periods, Holden was wrongfully deprived of the use of its money.  An award of prejudgment interest added to the compensatory damages will make Holden whole for the loss of the use of its money.  See Anastos, 443 Mass. at 155.

On the view we take of the case, there is no need, as Holden agrees, to reach Holden's cross appeal against Worcester and the DCR.

Judgment affirmed.

By the Court (Meade, Walsh & Smyth, JJ.[16]),

Clerk

Entered:  August 18, 2025.

---

[16] The panelists are listed in order of seniority.